IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| **MOTHER DOE and FATHER DOE,** <br> **on behalf of JOHN DOE, their minor** <br> **child,** <br><br>    ***Plaintiffs*,** <br><br> **-vs-** <br><br><br> **SUMNER COUNTY BOARD OF** <br> **EDUCATION D/B/A SUMNER** <br> **COUNTY SCHOOLS,** <br><br>   ***Defendant*.** | **)** <br> **)** <br> **)** <br> **)** <br> **)**   **Case No. 3:23-CV-00498** <br> **)** <br> **)**   **JURY DEMAND** <br> **)** <br> **)**   **JUDGE CAMPBELL** <br> **)**   **MAGISTRATE JUDGE HOLMES** <br> **)** <br> **)** <br> **)** |

## SECOND AMENDED COMPLAINT[1]

Plaintiffs, Mother Doe and Father Doe, on behalf of their minor son John Doe,[2] bring this

cause of action against Defendant, Sumner County Board of Education d/b/a Sumner County

Schools for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et*

*seq*., and violations of 42 U.S.C. § 1983:

### I.   INTRODUCTION

1.   Before football practice at Hendersonville High School on an otherwise normal

Thursday fall afternoon, John Doe was tackled to the ground and helplessly pinned down by a

---

[1] This Second Amended Complaint is filed to timely comply with the Court's September 28, 2023, Order. (Docket No. 37). Plaintiffs intend to file a Motion for Leave to further amend the Complaint due to additional evidence and facts that Plaintiffs' Counsel received from a non-party witness on October 3, 2023. Because Plaintiffs only just discovered this information late yesterday afternoon, Plaintiffs' are still awaiting an answer from Defendant's counsel regarding whether they oppose the proposed amendment. This Second Amended Complaint, therefore, includes **only** the Court's instructed changes. (Docket No. 37).

[2] The Court previously granted Plaintiffs' Motion for a Protective Order to Proceed Pseudonymously. (Docket No. 20).

Case 3:23-cv-00498  Document 38  Filed 10/04/23  Page 1 of 42 PageID #: 397

teammate double his size. John Doe's teammates stripped his pants and underwear down and smeared chocolate pudding inside his buttocks. John Doe's peers crowded around him and cheered during the assault. John Doe was horrified and utterly humiliated. To add insult to injury, John Doe's teammates and peers at Hendersonville High School continued to harass him after the assault.

2.     No child should have to endure sexual assault. The assault, at a federally funded school, could have been avoided in the first place if Sumner County Schools had complied with its Title IX obligations. Instead of assault prevention, Hendersonville High School was too focused on winning, allowing its players to engage in violence that included, *inter alia,* regularly stripping players' pants down and spanking their bare buttocks.

3.     This lawsuit may have been avoided if Sumner County Schools had responded to Plaintiffs' complaint in the way it is required to under Title IX. However, Sumner County Schools treated Plaintiffs crassly and callously, as if assault was no big deal, owing to its "anything goes" culture. As a result of Defendant's deliberate indifference and failure to provide Plaintiffs with Title IX-compliant due process, John Doe suffered not only trauma but educational harm, escaping to homeschooling and then, switching schools and football teams. By contrast, Sumner County Schools permitted two of the perpetrators—both facing criminal prosecution—to almost immediately return to school and finish their season as if nothing had happened. All other players involved received no discipline.

## II.     PARTIES

4.     Mother Doe is the mother and custodial parent of John Doe. She is a resident of Sumner County, Tennessee.

5.     Father Doe is the stepfather and custodial parent of John Doe. He is a resident of

2

Sumner County, Tennessee.

6.     John Doe is a minor child in the custody of Mother Doe and Father Doe and is a resident of Sumner County, Tennessee. During the events described herein, John Doe was a 15-year-old student in the tenth grade at Hendersonville High School.

7.     Sumner County Board of Education d/b/a Sumner County Schools ("Defendant") is a Tennessee governmental entity receiving state and federal funds to operate public schools within Sumner County, including Hendersonville High School.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*., 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

9.     This Court has jurisdiction over this matter as Defendant, through its school board, operates public schools for Sumner County, Tennessee, including Hendersonville High School. Defendant receives state and federal funding to operate Hendersonville High School and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a), and 42 U.S.C. § 1983.

10.    Venue is proper in that the acts complained of occurred in the Middle District of Tennessee, namely in Hendersonville, Tennessee.

### IV.     FACTS

#### A.     DEFENDANT'S TITLE IX OBLIGATIONS—GENERALLY

11.    When a school accepts funds from the federal government for its education programs, it undertakes certain obligations and expectations under federal law as a condition of receiving those funds.

12.    Here, Defendant receives federal financial assistance for its education programs

and activities, including Hendersonville High School. As such, Defendant is a "Recipient" as defined in 34 C.F.R. § 106.2 and is subject to Title IX of the Education Amendments of 1972 (hereinafter "Title IX").

13.     Pursuant to Title IX, Defendant must ensure none of its students are excluded from participation in, denied the benefits of, or subjected to discrimination "on the basis of sex." 20 U.S.C. § 1681.

14.     Title IX's objective is two-fold: (1) to "avoid the use of Federal resources to support discriminatory practices", and (2) to "provide individual citizens *effective* protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979) (emphasis added).

15.     A Recipient violates Title IX when it has actual knowledge of actionable sexual harassment and responds with deliberate indifference.

16.     Actionable sexual harassment includes unwelcome conduct on the basis of sex that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the school's education program or activity." 34 C.F.R. § 106.30.

17.     One single instance of sufficiently severe one-on-one peer harassment can qualify as Title IX sexual harassment and have the systemic effect of denying the victim equal access to an educational program or activity. *See Davis v. Monroe County Board*, 526 U.S. 629, 652–53 (1999).

18.     As explained throughout this Complaint, Defendant failed to comply with Title IX and violated John Doe's individual rights under Title IX, ultimately depriving him of equal access to education.

### B.     SEXUAL ASSAULT AND HARASSMENT OF JOHN DOE

19.     Before football practice on Thursday, September 29, 2022, John Doe was in the

4

locker room looking at his phone.

20.  Assaulter-1,[3] a 350-pound, 6'3" Hendersonville lineman, grabbed John Doe's phone and ran away with it out of the locker room and into the fieldhouse.

21.  Assaulter-1 ran past Hendersonville staff offices and into an open fieldhouse for other Hendersonville students.

22.  John Doe chased Assaulter-1 around the fieldhouse to retrieve his phone.

23.  Finding his phone on the ground, John Doe went to pick it up. As he did, Assaulter-1 tackled John Doe.

24.  Assaulter-1—who is more than double John Doe's weight—immediately got on top of John Doe. John Doe feared the worst, knowing that Assaulter-1 was among the athletes who perpetrated the culture of naked butt whippings.

25.  A mob of teammates gathered around John Doe, with at least one teammate chanting, "Get his pants! Get his Pants!"

26.  The mob jerked John Doe's pants and underwear to his knees as Assaulter-1 kept John Doe pinned to the ground. John Doe's intimate parts were at that point completely exposed for the team (and any onlookers) to see.

27.  With John Doe's pants still pulled down, Assaulter-2, a Hendersonville starting player, grabbed a chocolate pudding cup, opened the pudding cup, put his hands inside the pudding cup, and wiped the chocolate pudding up inside of John Doe's buttocks. The football players roared in laughter at what amounts to a violent sexual assault stemming from a program that had long ago lost control of its own athletic program.

---

[3] Although Fed. R. Civ. P. 5.2 allows for minors to be identified by their initials, Plaintiffs refer to all minors involved pseudonymously—at least for purposes of this public Complaint—to minimize the risk of further harassment to John Doe.

28.     No Hendersonville teammate stepped in to stop this. Instead, John Doe's peers and teammates stood in a circle around John Doe enabling, encouraging, watching, laughing, hooping, and hollering as John Doe was stripped down and sexually assaulted.

29.     At least two other Hendersonville players filmed this incident like it was entertainment to be captured and never forgotten.

30.     This sexual assault was so well orchestrated and deliberate it appeared to have been planned in advance.

31.     Once this inhumane act was finally over, John Doe ran into the bathroom stall to clean himself up.

32.     John Doe had never felt such extreme humiliation, sadness, and anger in his life.

33.     To add insult to injury, some teammates looked over the bathroom stall laughing at John Doe while he cleaned himself up.

34.     While John Doe was cleaning himself up, or sometime thereafter, another teammate was stripped naked by a Hendersonville teammate which also resulted in criminal prosecution.

35.     John Doe's teammates' objective in assaulting John Doe included diminishing John Doe's masculinity and male identity.

36.     Even to the present day, John Doe has thought of himself as less of a man because of the sexual assault.

37.     When his teammates pinned him to the ground and pulled his underwear down without his consent, John Doe feared the sexual assault could be taken even further.

38.     The harassment did not stop there. John Doe's teammates ridiculed and further humiliated John Doe at practice on Thursday and Friday before the game.

39.     The news about what had happened quickly spread and many Hendersonville

6

students knew about the sexual assault. One Hendersonville football player shared a video of the sexual assault to the team's Snapchat Group chat.

40. In class on Friday morning and at lunch, Hendersonville students heckled John Doe and told John Doe sexually-explicit statements like "I heard you basically got raped yesterday."

41. Hendersonville students made these sexually harassing statements to John Doe *after* Defendant had actual notice of the sexual misconduct. The ongoing sexual harassment occurred because of Defendant's failure to promptly address John Doe's complaint of sexual misconduct, as explained in the following section.

42. The harassment against John Doe continued in the weeks thereafter and even followed him to his new school,[4] which is within Defendant's school district.

## C.  DEFENDANT AND HENDERSONVILLE HIGH SCHOOL'S HISTORY AND CULTURE OF DELIBERATE INDIFFERENCE

43. In the past, Defendant's athletic departments have mishandled and responded with deliberate indifference to numerous incidents of sexual misconduct, hazing, and bullying.  It is this *history* which created a culture of "stripping and whipping," with John Doe being among the latest victims.

44. To the best of Plaintiffs' knowledge, based on information received from a Hendersonville coach and teammate, a Hendersonville High School athlete was previously sexually assaulted with a broomstick by male Hendersonville teammates. The culture that gave rise to the previous sexual assault included undisciplined roughhousing, hazing, and bullying.

45. Based on this prior incident of sexual misconduct, Defendant knew that failure to discipline its athletes for rough housing, hazing, and bullying could result in an escalation of

---

[4] The name of the school John Doe transferred to is being withheld out of further protection for John Doe's identity.

inappropriate behavior, ultimately resulting in sexual assault.

46.     Despite prior incidents of sexual harassment within its athletic departments, Defendant did not train Hendersonville coaches on student-on-student sexual harassment, on Title IX, and its requirements. Specifically, Defendant did not train Hendersonville coaches on how to recognize student-on-student sexual harassment.

47.     Here, John Doe is an African American boy who, as a sophomore, played football on Hendersonville High School's football team.  Sumner County created a football program filled with sexism, so much so that it became the usual rather than unusual behavior.

48.     The same teammate who sexually assaulted John Doe referred to himself, on at least one occasion, as John Doe's "master."

49.     Teammates also regularly called each other derogatory slurs including "p----" and "b----".

50.     Sumner County tolerated a practice of its players pulling teammates' pants and underwear down and whipping each other's bare buttocks in the locker room without consent.

51.     Whipping teammates' bare buttocks in the Hendersonville locker room was commonplace, often occurring on someone's birthday.

52.     It was also common for certain players to pull other teammates' pants and underwear down unexpectedly.

53.     In addition to the buttocks whipping, Hendersonville players would regularly hit and beat each other to the point of bruising. In one incident a player was hurt so badly by his teammate that he could not play football for a time and had to have medical treatment for the injuries arising from the beating. To the best of Plaintiffs' knowledge, this incident occurred prior to the assault of John Doe.

54.     Hendersonville football coaches were in and out of the locker room and, given the frequency of the butt whippings and hazing, must have seen, and therefore had actual notice of the practice. To Plaintiffs' knowledge, there was no effective discipline administered, with the practice continuing unabated.

55.     John Doe never participated in the butt whippings and always hoped it would never happen to him.

56.     Because of the culture of whipping bare buttocks and physical bullying without consequence, Sumner County created an "anything goes" culture within its football program.

57.     Defendant's prior mishandlings of sexual misconduct, paired with the accepted culture of harassment and bullying on the Hendersonville football team, show that Defendant had actual knowledge of sexual harassment and maintained a policy of deliberate indifference to sexual harassment.

58.     This deliberate indifference created a known and obvious heightened risk of sexual harassment to students, which led to John Doe suffering harassment that was so severe, pervasive, and objectively offensive that he was deprived of equal access to Hendersonville's educational opportunities and benefits.

### D.     **DEFENDANT RESPONDS WITH DELIBERATE INDIFFERENCE UPON ACTUAL NOTICE**

59.     When Mother Doe picked John Doe up from football practice the day John Doe was sexually assaulted around 3:00 PM, she immediately knew something was wrong.

60.     John Doe, after some encouragement from Mother Doe, told her what had happened while still in the car in the Hendersonville parking lot.

61.     Right then, Mother Doe asked to speak with Head Coach Beasley and gave Coach Beasley the explicit details about the sexual assault. As Coach Beasley is a coach and employee

9

of Defendant, Defendant had actual notice of the sexual assault on September 29, 2022, the same day of the assault.

62. Hendersonville Coaches may have had actual notice of the sexual assault even earlier than the conversation with Head Coach Beasley, as the assault took place in the fieldhouse, an open area that coaches and trainers may have been in while the assault took place.

63. In the conversation, it was clear Coach Beasley did not recognize or appreciate the gravity of what had happened on his team and in the field house.

64. For example, Coach Beasley almost immediately brought Assaulter-1 to speak with John Doe face-to-face after the assault was reported to him.

65. Coach Beasley forced Assaulter-1 to apologize to John Doe in that same conversation. But no further action was taken.

66. Coach Beasley ended the conversation by telling John Doe, "No one likes a tattle tale."

67. In that initial conversation, Coach Beasley did not apprise Mother Doe or John Doe of their rights under Title IX, any information regarding Hendersonville's sexual harassment grievance procedure, or any information regarding Title IX supportive measures.

68. The next day at approximately 2 PM, Father Doe went to Hendersonville High to speak with Head Coach Beasley regarding what had happened.

69. By 2 PM on Friday, September 30, 2022—one day after the assault—Head Coach Beasley had not yet notified Defendant's Title IX coordinator or any other senior administrators, including Hendersonville's Principal, of what had happened, and Defendant had not yet initiated any investigation.

70. In the conversation between Father Doe and Head Coach Beasley, Coach Beasley

made many statements to Father Doe that indicated he was untrained and unequipped to handle a Title IX report. Head Coach Beasley told Father Doe: (a) that his football program had many problems; (b) that he did not know what to do regarding what had happened, and (c) that he did not know whom to punish or how to punish them.

71.     Indeed, due to Defendant's failure to train, Coach Beasley was untrained and unequipped to handle a Title IX report of sexual harassment.

72.     Even so, Coach Beasley also implied that this assault was somehow John Doe's fault, saying: "Doesn't [John Doe] have some kind of mental problem?" Whatever Coach Beasley may have been implying, John Doe does not have any mental disability that might have masked whether he somehow consented to the violent sexual assault.

73.     Coach Beasley also told Father Doe that he would talk to the players *after* the football game that night.

74.     Father Doe stressed to Head Coach Beasley that the involved players should not be allowed to even *play* in the game that night.

75.     Head Coach Beasley's primary concern was winning the football game that night.

76.     When it was clear Defendant had done nothing upon learning of the sexual assault, Father Doe went to the Hendersonville police department to file an incident report.

77.     When Father Doe arrived at Hendersonville's police department to make a report, they told him to reach out to Sumner County's Sheriff Department.

78.     Father Doe drove out to Sumner County's Sheriff Department in Gallatin, TN to make the report.  At some point, the Sheriff's Department involved Hendersonville's School Resource Officer, Officer Johns.

79.     Officer Johns told Father Doe that there were two possible routes on how they could

11

handle it—either the school could handle it, or law enforcement could handle it.

80.     As Title IX rights and procedures are not mutually exclusive from law enforcement's procedures, Officer John's statement shows Defendant's failure to train its faculty and staff on Title IX rights and procedures.

81.     Hendersonville's athletic director, Ron Sarver, was not notified of the sexual assault until Officer Johns reached out to him on Friday afternoon on September 30, 2022.

82.     Notably, Hendersonville's athletic director and School Resource Officer would never have been involved without Father Doe filing a report with law enforcement on his own accord.

83.     Although Dr. Sarver and Officer Johns allegedly talked with some players that Friday afternoon or evening upon learning of the allegations, these interviews were not formal, nor were they administered by an unbiased, neutral party.

84.     Moreover, *before* Defendant conducted interviews of the additional players involved over the next few weeks, Coach Beasley and other coaches told the team not to talk about the incident. Another coach indicated to the team that Assaulter-1 and Assaulter-2 should not have received any punishment for what they had done. This injected a motivation *against* John Doe created at the coaching level.

85.     Despite her obligation to do so, Defendant's Title IX Coordinator, Katie Brown, did not promptly contact John Doe to discuss the availability of supportive measures upon Defendant's actual notice of the assault. Indeed, to the best of their recollection, Plaintiffs initiated contact with Katie Brown.

86.     Defendant's Title IX Coordinator, Katie Brown, did not inform John Doe of the available supportive measures with or without filing a formal Title IX complaint.

12

87. Defendant's Title IX Coordinator Katie Brown did not explain to Plaintiffs the process for filing a formal Title IX complaint.

88. Instead, the onus was on Plaintiffs to figure out how to proceed forward.

89. The following days, weeks, and months, Father and Mother Doe repeatedly requested Hendersonville coaches and administration and Defendant's Board Members to step up and do their part to make sure John Doe was not denied equal access to educational benefits.

90. On numerous occasions, both verbally and via email, Plaintiffs alleged to Defendant and Defendant's employees and administrators that the behavior was sexual harassment, and that John Doe was being denied equal access to educational benefits.

91. When responsive, Defendant's administrators offered Plaintiffs vague answers, lack of empathy, and/or callousness toward Plaintiffs' questions and requests.

92. Defendant left Plaintiffs in the dark regarding the status of any investigation or grievance procedure regarding the sexual harassment. The little information Defendants offered was not helpful nor consistent with Title IX regulations, as explained further herein.

93. Notably, Hendersonville's Principal Bob Cotter responded coldly, defensively, and dismissively. Father Doe reached out to Principal Cotter on Sunday, October 2, 2022, and expressed concern that a video still existed containing the sexual assault of their son. Principal Cotter responded to Father Doe via email, stating in part, "[The phone] will not be seized today . . . If you feel the need to do more then go ahead."

94. Principal Cotter and his designees also failed to adhere to Defendant's policy and procedures regarding sexual harassment and bullying, as explained further herein.

13

95.     Mother and Father Doe requested **no less than eight** times that Defendant put in place a safety plan so that John Doe could safely return to school and practice and not face further harassment by his teammates.

96.     After multiple follow-ups via email, in-person conversations, and telephone calls, Katie Brown, Defendant's Title IX Coordinator, finally offered a safety plan on Thursday, October 6, 2022—seven days after the incident—and after John Doe had already missed four days of practice and was forced to ride the bus and face his assaulters the day after the assault.

97.     The "safety plan" stated the "students directly involved" would not be allowed on the team "for at least [that] week." Because that plan was sent on a Thursday, Ms. Brown implied the unidentified students would be back at school and on the team the very next Monday.

98.     The "safety plan" did not indicate which students she was referring to. This was not helpful given John Doe was assaulted by numerous teammates.

99.     The "safety plan" indicated that John Doe could report "any new incidents" to Coach Lake or Mrs. DeJorge. Yet, Head Coach Beasley had already told John Doe "No one likes a tattle tale," indicating to John Doe that he would be retaliated against for reporting any similar incidents in the future.

100.     Defendant also did not enforce the "safety plan."

101.     For example, the day after Katie Brown sent the plan, Assaulter-1 and Assaulter-2—two of the main aggressors—showed up to the home football game with ski masks on.

102.     As evidenced by the foregoing facts, the "safety plan" did not protect John Doe or help him feel safe.

103.     Finally, the plan did not offer any supportive measures for John Doe as an individual, such as counseling or restrictions on contact between the parties.

14

104.    The "safety plan" did not consider John Doe's wishes, as required under Title IX.

105.    The "safety plan" did not address the fact that video footage of the sexual assault of John Doe was still on at least two teammates' phones and potentially circulating on the internet for other students to see.

106.    Defendant never seized the phones containing the video footage of the sexual assault despite Defendant's authority to do so.[5]

107.    Defendant also repeatedly told Plaintiffs that it legally could not share results of the discipline against minor students. As explained further herein, this policy is in direct contradiction to federal law.

108.    Due to Defendant's initial deliberate indifference, John Doe was left with no other option but to homeschool initially. As a result of Defendant's continued deliberate indifference and failure to follow Title IX-compliant due process, John Doe ultimately transferred schools.

### E.    DEFENDANT'S DELIBERATE INDIFFERENCE POST-FORMAL COMPLAINT

109.    After the sexual assault, Defendant never communicated to John Doe, Mother Doe, or Father Doe the steps in its Grievance Process pursuant to 34 C.F.R. § 106.45.

110.    Defendant also never communicated to Plaintiffs how to file a formal complaint of Title IX sexual harassment to trigger the 34 C.F.R. § 106.45 Grievance Process.

111.    Defendant's Title IX sexual harassment policy is very difficult to find on its website and was not easily accessible to Plaintiffs.

112.    The Title IX policy on Defendant's website also does not clarify how to formally

---

[5] *See* Hendersonville High School 2022-2023 Student and Parent Guide, 8-9, *available at* https://hhs.sumnerschools.org/images/docs/2022/HHS_Student_Handbook_10-12-2022.pdf; Sumner County Board Policy § 6.312, *available at* http://go.boarddocs.com/tn/scstn/Board.nsf/goto?open&id=C3SUB276AEC1.

15

file a Title IX complaint of sexual harassment.

113.    Father Doe believed that his initial conversation with Head Coach Beasley on September 30, 2022, conversation with Athletic Director Ron Sarver on October 2, 2022, his numerous emails and conversations to Principal Cotter, Athletic Director Ron Sarver, and Defendant's board members on October 2, 2022, and thereafter, all qualified as filing a formal complaint to trigger an official Title IX grievance process.

114.    When Father Doe and Mother Doe's previous formal complaints to Principal Cotter, Ron Sarver (Hendersonville's Athletic Director), Coach Beasley, Officer Johns, Katie Brown, and Jessica deJorje (a Hendersonville Assistant Principal) were not being taken seriously nor triggering a formal Title IX process, Father Doe took it a step further to ensure a formal sexual harassment complaint was filed with Defendant.

115.    **Plaintiffs maintain that Father Doe's initial conversation with Head Coach Beasley on September 30, 2022, conversation with Athletic Director Ron Sarver on October 2, 2022, and his numerous emails to Principal Cotter and Athletic Director Ron Sarver on October 2, 2022, were all formal Title IX complaints—as that term is defined in 34 C.F.R. § 106.30.**

116.    However, because Defendant's Title IX policy is unclear on how to file a formal Title IX complaint, Father Doe (at a minimum) effectuated filing a formal Title IX complaint with Defendant *no later* than Monday, October 10, 2022.

117.    Father Doe (at a minimum) effectuated filing a formal Title IX complaint by sending an email on Monday, October 10, 2022, at **6:35 AM** to Tammy Hayes, Defendant's Board member representing Plaintiffs' district.

118.    Father Doe's email to Tammy Hayes stated, in part, "[T]his serves as an official

16

complaint per Code 6.304 for sexual harassment, bullying, and discrimination related to the incident at Hendersonville High School that occured [sic] on Thursday, September 29, 2022."

119.    Father Doe further states, "The incident was sexual in nature as my son's buttock was forcefully exposed and marred."

120.    Father Doe sent a follow up email at **5:19 PM** on the same day (on Monday, October 10, 2022) to Tammy Hayes because he had not yet received any response from Defendant.

121.    Later that night, Tammy Hayes responded to Father Doe via email by stating she had forwarded his email and formal Title IX complaint to Del Phillips (Defendant's Director of Schools), Katie Brown, Craig Ott, Hendersonville's Principal Bob Cotter, Hendersonville's Athletic Director Ron Sarver, and Jeremy Johnson.

122.    Upon receiving the formal Title IX complaint from Father Doe on John Doe's behalf, Defendant did not comply with the timelines and requirements set out in its Title IX policy.

123.    More significantly, upon receiving the formal complaint from Father Doe on John Doe's behalf, Defendant did not comply with a Grievance Process that satisfies 34 C.F.R. § 106.45, as explained further herein.

124.    Defendant did not keep Plaintiffs apprised of how the school was following through with the complaint after Father Doe's October 10, 2022, email.

125.    After Father Doe followed up numerous times for answers, Defendant (through Craig Ott) finally sent Father Doe a letter on November 14, 2022.

126.    The November 14, 2022, letter states:

In accordance with Sumner County School Board Policy 6.304, Discrimination, Harassment, Bullying and Retaliation, I conducted an investigation with Bob Cotter, Principal of Hendersonville High School, concerning the incident that occurred in the HHS football field house between [John Doe] and several other student athletes on Thursday, September 29,2022.

17

I have officially closed my investigation and have submitted my findings to Dr. Del Phillips, Director of Schools, who has issued corrective action.

127. As explained further herein, this vague letter does not comply with Title IX regulations regarding a final determination for a Title IX complaint. The letter does not indicate what the findings were, what corrective action was administered, who the corrective action was administered against, and what steps were taken to determine the findings.

128. Moreover, this letter shows that Defendant failed to administer an investigation by a neutral third-party. Father Doe had already made numerous complaints to Principal Cotter about his and his faculty's handling of the initial report of the sexual assault. Principal Cotter allegedly interviewed some students *after* Father Doe had already made this personal complaint, making Principal Cotter a biased fact-finder.

129. After Father Doe reached out to Craig Ott and Del Phillips asking for more information, Dr. Phillips responded to Father Doe stating: "It's my understanding that Mr. Ott has provided the information *we are allowed* to share with you. We are not *able by law to share some details about the investigation or personnel matters*." (Emphasis added).

130. Dr. Phillips' response is false. The Title IX regulations and 2020 Amendments clarify what information Plaintiffs were entitled to. As explained further herein, Plaintiffs were entitled to much more information than what little information Defendant gave over. Dr. Phillips' email shows Defendant's ignorance regarding its obligations under Title IX and the 2020 Amendments.

## F. THE 2020 AMENDMENTS

131. Prior to 2020, federal regulations did not provide specific requirements for schools related to Title IX sexual harassment.

132. Without federal regulations regarding sexual harassment, Courts formerly looked

18

to several guidance documents issued by the Office of Civil Rights throughout the years and relied upon precedential caselaw to determine whether a student's Title IX rights had been violated in the context of sexual harassment.

133. In 2020, however, the Department of Education issued a final rule to offer more clarity and effectuate Title IX's purpose.

134. This final rule imposed "for the first time, **legally binding** rules on recipients with respect to responding to sexual harassment." "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" 85 Fed. Reg. 30,026, 29 (May 19, 2020) (emphasis added) (hereinafter, the "2020 Amendments").

135. The 2020 Amendments codified and expanded standards and definitions already addressed in Supreme Court caselaw. Consequently, Recipients (including Defendant) now have explicit and clear notice of their obligations on how to respond to allegations of sexual harassment.

136. For example, the 2020 Amendments clarified that an elementary and secondary school Recipient has "actual notice" of sexual harassment whenever *any school employee* knows of behavior that *may* constitute sexual harassment. 34 C.F.R. §§ 106.30(a); 106.44(a).

137. This "actual notice" definition includes any teacher, teacher's aide, bus driver, cafeteria worker, counselor, school resource officer, maintenance staff worker, coach, athletic trainer, or any other school employee. 85 Fed. Reg. at 30,109, 30,115.

138. The 2020 Amendments also sought to provide Recipients with prescribed procedures that ensure that Title IX is enforced consistent with both constitutional due process, and fundamental fairness, such that a student has the benefit of a *consistent, transparent* grievance process with strong procedural protections.

139. As such, the 2020 Amendments clarify that a Recipient must respond *promptly* and

19

*appropriately* when it receives *notice* of alleged facts that, if true, could be considered sexual harassment. 85 Fed. Reg. at 30,192.

140.    Notably, a "recipient's *treatment of a complainant* . . . in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX." 34 C.F.R. § 106.45 (emphasis added).

141.    Defendant's general obligations under Title IX and the 2020 Amendments include at least the following:

a)    Endeavor to *prevent* sexual harassment from occurring in the first place;

b)    Must train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, regarding: the definition of sexual harassment in 34 C.F.R. § 106.30, the scope of Defendant's education program or activity, how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias;

c)    Must make training materials publicly available on its website;

d)    Respond to allegations of sexual harassment promptly in a manner that is not deliberately indifferent;

e)    Treat complainants and respondents equitably by offering supportive measures to complainants;

f)    Defendant's Title IX Coordinator *must* do the following upon Defendant's actual notice of the sexual harassment: *promptly* contact a complainant to discuss the availability of supportive measures; consider a complainant's wishes with respect

20

to those supportive measures; inform a complainant of the supportive measures with or without filing a formal Title IX complaint; and *explain* to a complainant the process for filing a formal complaint; and,

g) Defendant must follow a grievance process that complies with 34 C.F.R. § 106.45 (hereinafter, the "Grievance Process") when a formal Title IX complaint is filed.

142. As explained throughout this Complaint, Defendant failed to comply with each of the foregoing obligations.

## G. DEFENDANT'S FAILURE TO IMPLEMENT AND FOLLOW A GRIEVANCE PROCESS THAT SATISFIES 34 C.F.R. § 106.45

143. A parent or guardian who has a legal right to act on behalf of an individual can file a formal Title IX complaint on that individual's behalf. 34 C.F.R. § 106.6(g). Here, Plaintiffs filed a formal Title IX complaint for the assault against John Doe *no later* than October 10, 2022. Plaintiffs maintain they made numerous formal verbal and written complaints to Defendant as early as September 29, 2022, and thereafter.

144. When a formal Title IX complaint is made, Defendant must follow a Grievance Process under 34 C.F.R. § 106.45 that:

a) Treats complainants and respondents equitably;

b) Provides remedies to a complainant where a determination of sexual harassment has been found that are designed to restore or preserve equal access to Defendant's education program or activity;

c) Requires an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence;

d) Provides that credibility determinations may not be based on a person's status as a complainant, respondent, or witness;

21

e)   Ensures that any individual designated to facilitate an informal resolution process (i.e. Title IX Coordinator, investigator, or decision-maker), does not have a conflict of interest or bias for or against complainant or respondents generally or an individual complainant or respondent;

f)   Includes reasonably prompt time frames for conclusion of the Grievance Process, including reasonably prompt time frames for filing and resolving appeals and informal resolution processes if Defendant offers informal resolution processes;

g)   Describes the range of possible disciplinary sanctions and remedies or list the possible disciplinary sanctions and remedies that the recipient may implement following any determination of responsibility;

h)   States whether the standard of evidence used to determine responsibility will be preponderance of the evidence or clear and convincing evidence;

i)   Includes the procedures and permissible bases for the complainant and respondent to appeal; and,

j)   Describes the range of supportive measures available to complainants and respondents.

145.   Here, Defendant does not have a Grievance Process that complies with the foregoing obligations under 34 C.F.R. § 106.45. Indeed, upon information and belief, Defendant's Title IX policy has not been updated or revised since September 16, 2014—six years prior to enactment of the 2020 Amendments.

146.   Defendant's failure to update its Title IX policy since enactment of the 2020 Amendments further exemplifies Defendant's deliberate indifference toward sexual harassment.

147.   When Defendant receives a formal Title IX complaint, it must also provide written

22

notice to a complainant pursuant to 34 C.F.R. § 106.45(b)(2) that includes the following:

a)   Notice of Defendant's Grievance Process that complies with 34 C.F.R. § 106.45, including any informal resolution process;

b)   Notice of the allegations of sexual harassment potentially constituting sexual harassment as defined in 34 C.F.R. § 106.30, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview;

c)   Notice that the parties may have an advisor of their choice, who may be, but is not required to be, an attorney; and,

d)   Notice that the parties may inspect and review evidence.

148.   Here, Defendant did not provide written notice to Plaintiffs with the foregoing required information upon Plaintiffs' submission of a formal Title IX Complaint.

149.   When investigating a formal complaint and throughout the Grievance Process, pursuant to 34 C.F.R. § 106.45 (b)(5) Defendant must:

a)   Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on Defendant and not on the parties;

b)   Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence;

c)   Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence;

d)   Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, who may be, but is not

23

required to be, an attorney, and not limit the choice or presence of advisor for either the complainant or respondent in any meeting or grievance proceeding;

e)  Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate;

f)  Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation;

g)  Prior to completion of the investigative report, Defendant must send a complainant the evidence subject to inspection and review in an electronic format or a hard copy;

h)  Upon receiving the investigative report from Defendant, the parties must have at least ten days to submit a written response;

i)  Defendant's investigator must consider the parties' written responses prior to completion of the investigative report;

j)  The recipient must make all such evidence subject to the parties' inspection and review available at any hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination;

k)  Defendant must create an investigative report (hereinafter "Investigative Report")

24

that fairly summarizes relevant evidence prior to a hearing or other time of determination regarding responsibility; and,

l)    Defendant must send the Investigative Report to a complainant and complainant's advisor for their review and written response at least ten days prior to the hearing or determination regarding responsibility.

150.    Here, Defendant did not comply with the foregoing requirements under 34 C.F.R. § 106.45(b)(5). Specifically, Defendant: (1) did not take responsibility for the burden of proof and the burden of gathering evidence in the investigation; (2) did not provide Plaintiffs equal opportunity to present evidence in the investigation; (3) did not provide Plaintiffs with the same opportunities as the respondents to have others present during any grievance proceeding; (4) did not provide Plaintiffs an equal opportunity to inspect and review any evidence; (5) did not send Plaintiffs the evidence prior to completion of the investigative report; (6) did not allow Plaintiffs the opportunity to respond to the investigative report; and (7) did not create an investigative report, or if Defendant did create an investigative report, that report was not sent to Plaintiffs prior to the final determination as required.

151.    After sending the Investigative Report to complainant but before reaching a determination regarding responsibility, the decision-maker must afford complainant the opportunity to submit written, relevant questions that complainant wants asked of any party or witness, provide parties with the answers, and allow for additional, limited follow-up questions from each party. 34 C.F.R. § 106.45 (b)(6)(ii). Here, Defendant did not afford Plaintiffs the opportunity to do the foregoing before reaching a determination regarding responsibility.

152.    Defendant's decision-maker regarding responsibility determination must not be the same person as the Title IX Coordinator or investigator. 34 C.F.R. § 106.45 (b)(7)(i). Here, upon

information and belief, Craig Ott and Principal Cotter were both the decision-makers and investigators.

153. Defendant's decision-maker must issue a written determination (hereinafter "Written Determination") regarding responsibility and apply the chosen standard of evidence when making that final determination. 34 C.F.R. § 106.45 (b)(7)(i).

154. Under 34 C.F.R. § 106.45 (b)(7)(ii), the Written Determination must include:

a)      Identification of the allegations potentially constituting sexual harassment;

b)      A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

c)      Findings of fact supporting the determination;

d)      Conclusions regarding the application of Defendant's code of conduct to the facts;

e)      A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the Defendant imposes on the respondent, and whether Defendant will provide complainant with remedies designed to restore or preserve equal access to the recipient's education program or activity; and,

f)      Defendant's procedures and permissible bases for the complainant and respondent to appeal.

155. Here, Defendant did not issue to Plaintiffs a Written Determination regarding responsibility and chosen standard of evidence as required. Specifically, the letter provided to Plaintiffs on November 14, 2022 failed to include: (1) Identification of the allegations potentially

constituting sexual harassment; (2) A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties; (3) Findings of fact supporting the determination; (4) Conclusions regarding the application of Defendant's code of conduct to the facts; (5) A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the Defendant imposed on the respondent; and (6) Defendant's procedures and permissible bases for Plaintiffs to appeal.

156.    Defendant must provide the Written Determination to both complainant and respondent simultaneously. 34 C.F.R. § 106.45(b)(7)(iii). Again, Defendant failed to provide Plaintiffs with a requisite Written Determination.

157.    Defendant's Grievance Process must also include the opportunity for a complainant to appeal a determination regarding responsibility and/or dismissal. 34 C.F.R. § 106.45 (b)(8)(i). Here, Defendant did not give Plaintiffs the opportunity to appeal the unknown decisions.

158.    Regarding all appeals, Defendant must:

a)      Notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties;

b)      Ensure that the decision-maker(s) for the appeal is not the same person as the decision-maker(s) that reached the determination regarding responsibility or dismissal, the investigator(s), or the Title IX Coordinator;

c)      Ensure that the decision-maker(s) for the appeal complies with the standards set forth 34 C.F.R. § 106.45 (b)(1)(iii);

d)      Give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome;

27

e) Issue a written decision describing the result of the appeal and the rationale for the result; and,

f) Provide the written decision simultaneously to both parties.

159. Here, Defendant did not have any kind of appeal process, or if it does, that process was not communicated to Plaintiffs. Even if Defendant has an appeal process, Plaintiffs were not given enough information to know whether to appeal.

160. Defendant has the option of facilitating an informal resolution process pursuant to 34 C.F.R. § 106.45 (b)(9), provided Defendant obtains the parties' voluntary, written consent to opt for the informal resolution process instead of the formal Grievance Process. Here, if Defendant has an option of an informal resolution process, that option was not communicated to Plaintiffs.

161. A Recipient's Grievance Process is not prompt or equitable unless a student knows it exists, knows how it works, and knows how to file a formal complaint. *See* Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) (Updated June 28, 2022), 33, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf.

162. Here, Plaintiffs did not know what Defendant's Grievance Process was, did not know how it worked despite repeated requests asking the same, and did not know how to file a formal complaint. This alone shows a violation of John Doe's rights under Title IX.

## H. DEFENDANT'S SEXUAL HARASSMENT POLICY, ON ITS FACE, VIOLATES TITLE IX AND THE 2020 AMENDMENTS

163. Defendant's sexual harassment policy and procedures are difficult to find.

164. Defendant's sexual harassment policy and procedures are vague.

165. Defendant's sexual harassment policy and procedures are confusing.

166. Moreover, Defendant's sexual harassment policy was apparently in contradiction with Hendersonville High School's sexual harassment policy. Specifically, at the time,

Hendersonville touted a "Zero-Tolerance" policy that mandated a one-year suspension for any student that assaults another student. Defendant later told Plaintiffs that the Hendersonville policy was in contradiction to Defendant's board policy.

167. The inconsistency between Defendant's policy and Hendersonville's policy created even more confusion and feelings of injustice for Plaintiffs when Assaulter-1 and Assaulter-2 were not suspended for one-year pursuant to Hendersonville's Zero-Tolerance policy.

168. Though it is difficult to find, Defendant has a policy online that outlines Defendant's sexual harassment policy and procedures (hereinafter the "Policy").[6]

169. Defendant's Policy does not facially comply with Title IX and the 2020 Amendments.

170. Defendant's Policy mandates that its school principals are responsible for receiving oral or written reports of discrimination, bullying, harassment, or sexual harassment at the school level and should be "initially handled by the building *Principal*." (Emphasis added).

171. Specifically for reports or complaints of student-to-student discrimination, bullying, harassment, or sexual harassment, Defendant's Policy states: "Upon receipt of a report, the *Principal* will make the determination as to how to handle the issue." (Emphasis added).

172. Upon receipt of a report or complaint alleging student-to-student sexual harassment, Defendant further requires: "the *individual* making the report [to] immediately follow the Sumner County Schools Reporting Protocols." (Emphasis added).

173. These two clauses contradict each other.

174. On the one hand, Defendant requires the *principal* to determine "how to handle the

---

[6] Sumner County Schools Board Policy Manual § 6.304, *available at* http://go.boarddocs.com/tn/scstn/Board.nsf/goto?open&id=BZTRY26D737D.

issue" of student-on-student harassment. On the other hand, Defendant requires the *individual* making the report to follow the "Sumner County Schools Reporting Protocols."

175. Notably, the "Sumner County Schools Reporting Protocols," if they exist at all, are nowhere to be found on Defendant's website and were never provided to Plaintiffs.

176. Defendant requires the building principal or his/her designee to *immediately* conduct a fact-finding to determine who is involved upon receipt of a report or complaint alleging discrimination, bullying, harassment, or sexual harassment.

177. The requirement for the principal to conduct an immediate fact-finding is in contradiction with Defendant's other statement that the "Principal will make the determination as to how to handle the issue," a statement which implies subjectivity.

178. Defendant requires that any staff member that receives a report of bullying, harassment, intimidation, or hazing must report it to the principal. Here, Head Coach Beasley did not report the incident to Principal Cotter upon receiving a report of harassment and bullying.

179. Upon receiving a report or complaint, Defendant requires the principal or his/her designee to conduct an initial interview of the complainant and the accused within 24 hours, never interviewing the complainant and accused together. Here, initial interviews were not conducted within 24 hours as required.

180. Defendant requires the principal and/or the designee to contact the parents of the complainant and accused within 24 hours of the report being received. Here, Mother and Father Doe did not receive contact from Defendant until approximately three days after the reported assault.

181. Defendant requires the principal or designee to proceed with the investigation to include the following:

(a)    Upon receipt of a report or complaint alleging bullying, harassment, or hazing, a Bully Incident Report must be filed with the Office of Safe Schools, Healthy Students using the Sumner County Schools Reporting Protocols.

(b)    Confidential interviewing of complainant and accused to be conducted within 24 hours of the report and witnesses involved to be conducted within 48 hours of receiving complaint (unless there are extenuating circumstances, which must be documented) and review student history and discipline files including documentary evidence.

(c)    Principal will conclude investigation within ten (10) school days and determine outcome. He/she will determine student consequences.

(d)    Both parents will be notified in writing and informed that the investigation has been completed within 48 hours. Discipline outcomes will not be shared with the complainant's parent.

(e)    The principal will send the final report or complaint alleging discrimination to the Title VI/IX coordinator.

(f)    The district will allow for adequate, reliable, and impartial investigation of all complaints, including the opportunity for the parties to present witnesses and other evidence.

(g)    During the investigation period, the district and/or school will take the necessary precautionary steps to provide for the safety of the victim(s) and the school community and the avoidance of retaliation. The district will ensure victims of their rights under Title IX and connect them to available community resources.

(h)    An appeal may be filed in the Office of the Director of Schools within five (5)

31

school days. A written response to the appeal will be made within five (5) days of receipt of the appeal request. The appeal, if granted, will be conducted in an impartial manner by an impartial decision-maker.

182. Defendant did not follow the foregoing procedure. Even if Defendant had, that procedure does not comply with the Grievance Process required under Title IX and the 2020 Amendments.

183. Ultimately, Defendant failed to adequately educate and inform the students and faculty at Hendersonville High School of the requirements of Title IX, failed to prevent the creation of a hostile sexual environment, and failed to adequately assist those who were sexually harassed or assaulted—specifically John Doe.

184. Defendant further failed to adequately educate, warn, and properly discipline students who engaged in sexual harassment, hazing, and/or bullying to sufficiently discourage the activity perpetrated on John Doe.

185. Defendant failed all around to effectuate due process for Plaintiffs and the Grievance Process required under Title IX.

## I.    JOHN DOE'S INJURY

186. Defendant was aware that John Doe was subjected to nonconsensual sexual activity and that a video of the sexual assault was potentially being disseminated; however, Defendant took no steps to ensure that the video of the sexual assault was permanently deleted.

187. John Doe withdrew from Hendersonville due to the existence of the video, continued harassment, lack of supportive measures, lack of information, lack of discipline for all players involved, and overall failure to provide John Doe with the due process proscribed in 34 C.F.R. § 106.45.

32

188.    John Doe suffered physical injury and trauma not only initially but continues to suffer from trauma nine months later. John Doe has received and will continue to receive counseling services stemming directly from the physical, sexual assault related to the events explained herein.

189.    John Doe was unable to complete the semester at Hendersonville due to Defendant's failure to address Mother Doe and Father Doe's safety concerns. Even after transferring schools, John Doe has faced further harassment by his peers at his new school because of what happened to him.

190.    John Doe's grades suffered and continue to suffer as a result of the initial assault, harassment thereafter, and inability to have a continuous school year at the same school.

## CAUSES OF ACTION

## TITLE IX

191.    In recognition of the fact that "sex discrimination reaches into all facets of education," Congress passed Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which prohibits discrimination on the basis of sex under any federally funded education program or activity.

192.    Title IX requires schools like Hendersonville to address and remediate sex-based harassment. *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Schs*., 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

193.    As shown below in Counts One and Two, Sumner County Board of Education spectacularly failed to prevent, investigate, *and* remedy the sexual harassment of John Doe, all in violation of Title IX. Accordingly, Plaintiffs seek declaratory relief to reflect the Title IX violations and injunctive relief to include an order that Sumner County develop and implement Title IX

33

investigatory processes consistent with Title IX; an order to train staff, parents, and students about the availability of the formal process of Title IX; along with monetary damages and out-of-pocket costs relating to health costs, time, and travel. They also seek their attorneys' fees and costs.

## COUNT ONE: VIOLATION OF TITLE IX *BEFORE* INCIDENT

194.    Plaintiff asserts that the conduct set forth above, in paragraphs 1-191, constitutes a violation of Title IX of the Education Act of 1972, 20 U.S.C. § 1681(a) *et seq*.

195.    Defendant maintained a policy of deliberate indifference to reports of sexual misconduct, especially within its schools' athletic departments.

196.    Defendant's policy of deliberate indifference toward sexual harassment is shown at a minimum by its failure to train administration and coaches regarding Title IX, its requirements, and how to identify student-on-student sexual harassment.

197.    Defendant's deliberate indifference created a heightened risk of sexual harassment that was known or obvious in a context subject to the school's control.

198.    Defendant's deliberate indifference and clearly unreasonable acts and omissions caused John Doe to suffer sexual harassment that was so severe, pervasive, and objectively offensive that he was deprived access to Defendant's educational opportunities and benefits.

199.    Defendant's deliberate indifference and failures to comply with Title IX *before* the incident include but are not limited to:

> (a)    Failing to adequately train its employees of Title IX requirements and the formal Grievance Process;
>
> (b)    Failing to maintain a Grievance Process that complies with 34 C.F.R. § 106.45;
>
> (c)    Failing to post its Title IX training materials online;

34

(d)  Failing to update its sexual harassment policy since enactment of the 2020 Amendments;

(e)  Failing to educate students about Title IX;

(f)  Failing to inform students of the ramifications for engaging in conduct that violates Title IX;

(g)  Permitting inappropriate sexual conduct between students to occur in Hendersonville's football locker room and field house without consequence;

(h)  Creating an environment that enabled sexual conduct to occur by allowing Hendersonville's locker room and open field house to remain unsupervised;

(i)  Creating an environment that enabled harassment and bullying by shaming players who reported inappropriate behavior;

(j)  Failing to take appropriate action to address and curtail the regular practice of whipping individuals' bare buttocks, even though Defendant was fully aware that such activity was occurring in its school system;

(k)  Failing to adequately discipline students engaged in behavior that creates a discriminatory and hostile environment; and,

(l)  Failing to educate, warn, and discipline students for recording and circulating videos of sexual acts involving other students.

200.  Had Defendant complied with Title IX *before* the incident occurred, the complained of harassment and/or unwelcome sexual activity would have been prevented and John Doe would not have been deprived equal access to educational benefits nor would have suffered damages.

35

## COUNT TWO: VIOLATION OF TITLE IX *AFTER* INCIDENT

201.   Plaintiff asserts that the conduct set forth above, in paragraphs 1-191, constitutes a violation of Title IX of the Education Act of 1972, 20 U.S.C.§1681(a) *et seq*.

202.   John Doe was subjected to student-on-student sex-based harassment, that was so severe, pervasive, and objectively offensive that it created a hostile educational environment and deprived John Doe of educational opportunities and benefits provided by the school.

203.   Defendant had actual knowledge of (1) the sexual assault and (2) the continuing bullying and harassment, yet failed to respond promptly and appropriately, instead acting with deliberate indifference.

204.   Defendant's policies, culture, and lack of transparency discourage sexual assault and harassment victims from coming forward and have a disparate impact on students that have experienced sexual harassment, further demonstrating deliberate indifference.

205.   Defendant failed to comply with Title IX through deliberate indifference and a clearly unreasonable response *after* unwelcome sexual conduct occurred that created an environment of continued harassment.

206.   Defendant's violations of Title IX *after* the initial assault include but are not limited to the following:

    a)   Forcing John Doe to face Assaulter-1 immediately after reporting;

    b)   Shaming John Doe for reporting by telling him "No one likes a tattle tale";

    c)   Failing to inform John Doe and his parents of John Doe's rights under Title IX;

    d)   Failing to inform Plaintiff of the existence of a Title IX coordinator;

36

e) Failing to promptly contact John Doe to discuss the availability of supportive measures;

f) Failing to consider John Doe's wishes with respect to those supportive measures;

g) Failing to explain to John Doe the process for filing a formal Title IX complaint;

h) Failing to give Plaintiffs adequate due process by not complying with a 34 C.F.R. § 106.45 Grievance Process upon Plaintiffs' filing the formal Title IX complaint;

i) Failing to comply with its own non-compliant harassment policy upon receiving actual notice of the assault;

j) Failing to administer an investigation by a neutral third party;

k) Failing to assure John Doe the behavior and harassing comments would not reoccur;

l) Failing to adequately punish the students who engaged in the unwelcome sexual activity and harassment;

m) Failing to punish and deter the students who recorded and circulated the videotape of the unwelcome sexual activity;

n) Failing to exercise control over the alleged harassment;

o) Failing to seize the phones containing video footage of the assault and exercising deliberate indifference to Mother and Father Doe's concern regarding the existence of said video;

37

p) Failing to take adequate steps to allow John Doe to complete his education in a safe environment free of sexual harassment and ridicule;

q) Failing to assist and support John Doe following the sexual assault, including counseling; and,

r) Failure to prepare and implement a plan to permit John Doe to return to the public school system without fear of ongoing harassment and ridicule.

207. Defendant's failure to comply with Title IX *after* the incident occurred resulted in further harassment and ridicule of John Doe. Consequently, John Doe had no way forward to continue at Hendersonville High and play on its football team.

## SECTION 1983 EQUAL PROTECTION CLAUSE

## COUNT THREE: VIOLATION OF 42 U.S.C. § 1983 FAILURE TO TRAIN

208. Plaintiff asserts that the conduct set forth above, in paragraphs 1-191, constitutes a violation of 42 U.S.C. § 1983, which resulted in John Doe's inability to remain at Hendersonville High.

209. Plaintiff asserts that Defendant violated the equal protection clause of the Fourteenth Amendment of the U.S. Constitution by failing to train its employees on the meaning of sexual assault and proper handling of complaints of sexual assault and harassment.

210. Defendant's training of its employees was either inadequate, or completely nonexistent, based on Defendant's failure to address the system-wide prevalence of known severe, pervasive, and objectively offensive sexual harassment and bullying that was occurring within its school system. Moreover, the violent, unlawful touching inside any student's buttocks while being pinned to the ground is a serious offense—whether male or female. Because Plaintiff is male,

38

Defendant minimized this conduct as acceptable "horseplay" rather than recognizing it as sexual assault.

211.     Defendant's training of its employees was either inadequate, or completely nonexistent, based at least on Hendersonville's failure to comply with Title IX requirements in response to the sexual assault of John Doe.

212.     The inadequacy, or nonexistence, of such training was the result of Defendant's deliberate indifference to the rights of its students because the foreseeable consequence of such inadequacy was a violation of students' equal protection rights.

213.     It is foreseeable that the failure to train school staff on the proper handling of sexual assault claims could result in the creation of a hostile environment for students and thus violate a student's equal protection rights.

214.     John Doe's injuries were closely related to or actually caused by Defendant's failure to adequately train its employees.

215.     If Hendersonville's principal, coaches, and administration had been properly trained and had taken necessary measures to curtail the circulation of the video after the incident, John Doe would not have suffered the injuries endured.

## COUNT FOUR: VIOLATION OF 42 U.S.C. § 1983 DELIBERATE INDIFFERENCE TO ONGOING HARASSMENT

216.     Plaintiffs assert that the conduct set forth above, in paragraphs 1-191, constitutes a violation of 42 U.S.C. § 1983.

217.     Plaintiffs assert that Defendant violated the equal protection clause of the Fourteenth Amendment of the U.S. Constitution by its inadequate response to the incident and its deliberate indifference to the ongoing harassment, which resulted in John Doe's inability to remain at Hendersonville.

218.     The Defendant was on notice that students' constitutional rights were being violated due to the pattern of stripping and whipping, there had been instances previous to John Doe's assault that were not adequately addressed and, even when John Doe was assaulted, the Defendant's reaction was so mild and indifferent that the need for training is obvious.

219.     John Doe was damaged as a result of Defendant's violation of 42 U.S.C. § 1983 deliberate indifference to ongoing harassment.

## JOHN DOE'S DAMAGES

220.     As a result of the Defendant's acts and omissions as set forth above, John Doe has suffered both physical and emotional injuries, including severe humiliation, embarrassment, loss of enjoyment of life, and loss of educational opportunity.

221.     Plaintiffs therefore seek damages for past and future medical expenses, past and future economic damages, past and future pain and suffering, past and future emotional injuries, including severe humiliation and embarrassment, past and future loss of enjoyment of life, past and future loss of educational opportunity, and all other damages available for violations of Title IX, 42 U.S.C. § 1983, and Title VI, including punitive damages to deter future noncompliance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     That process issue requiring Defendant to answer within the time provided by law;

2.     An award of all damages available under Title IX, the Equal Protection Clause, and all claims, including but not limited to, payment of Plaintiffs' past and future expenses incurred as a consequence of the violations, damages for deprivation of equal access to the educational benefits and opportunities provided by Defendant, loss of future earning capacity, and damages for past, present, and future physical and emotional pain and suffering, ongoing and severe

mental anguish, and loss of past, present, and future enjoyment of life, in an amount to be determined at trial;

3.    An award of punitive damages pursuant to 42 U.S.C. § 1983 and/or other statutory authority;

4.    Injunctive relief requiring Defendant to comply with the requirements of Title IX;

5.    Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, *et seq.* and/or other statutory authority;

6.    Such further relief that this Court deems proper to enforce Title IX in Sumner County Schools; and,

7.    That a jury of twelve be empaneled to hear and try all issues submitted.

Respectfully submitted,

**HB ADVOCATES PLLC**

/s/ Hayley H. Baker
Hayley Hanna Baker, TN Bar No. 37439
3820 Charlotte Avenue
Suite 146-24
Nashville, Tennessee 37209
Email: hbaker@hb-advocates.com
Phone: (615) 505-3260

*Attorney for Plaintiffs*

**GILBERT LAW, PLC**

/s/ Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
justin@schoolandworklaw.com

*Attorney for Plaintiffs*

41

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2023, a copy of the foregoing was served via the Court's ECF system on the following:

E. Todd Presnell
Casey L. Miller
Ocasha Musah
Tara S. Sarosiek
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: 615.252.2393
F: 615.252.6393
tpresnell@bradley.com
cmiller@bradley.com
omusah@bradley.com
tsarosiek@bradley.com

/s/ Hayley H. Baker

42