**Not for Reliance for Certain Purposes.** This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS

October 26, 2010

Dear Colleague:

In recent years, many state departments of education and local school districts have taken steps to reduce bullying in schools.  The U.S. Department of Education (Department) fully supports these efforts.  Bullying fosters a climate of fear and disrespect that can seriously impair the physical and psychological health of its victims and create conditions that negatively affect learning, thereby undermining the ability of students to achieve their full potential.  The movement to adopt anti-bullying policies reflects schools' appreciation of their important responsibility to maintain a safe learning environment for all students.  I am writing to remind you, however, that some student misconduct that falls under a school's anti-bullying policy also may trigger responsibilities under one or more of the federal antidiscrimination laws enforced by the Department's Office for Civil Rights (OCR).  As discussed in more detail below, by limiting its response to a specific application of its anti-bullying disciplinary policy, a school may fail to properly consider whether the student misconduct also results in discriminatory harassment.

The statutes that OCR enforces include Title VI of the Civil Rights Act of 1964[1] (Title VI), which prohibits discrimination on the basis of race, color, or national origin; Title IX of the Education Amendments of 1972[2] (Title IX), which prohibits discrimination on the basis of sex; Section 504 of the Rehabilitation Act of 1973[3] (Section 504); and Title II of the Americans with Disabilities Act of 1990[4] (Title II).  Section 504 and Title II prohibit discrimination on the basis of disability.[5]  School districts may violate these civil rights statutes and the Department's implementing regulations when peer harassment based on race, color, national origin, sex, or disability is sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees.[6]  School personnel who understand their legal obligations to address harassment under these laws are in the best position to prevent it from occurring and to respond appropriately when it does.  Although this letter focuses on the elementary and secondary school context, the legal principles also apply to postsecondary institutions covered by the laws and regulations enforced by OCR.

Some school anti-bullying policies already may list classes or traits on which bases bullying or harassment is specifically prohibited.  Indeed, many schools have adopted anti-bullying policies that go beyond prohibiting bullying on the basis of traits expressly protected by the federal civil

---

[1] 42 U.S.C. § 2000d *et seq.*
[2] 20 U.S.C. § 1681 *et seq.*
[3] 29 U.S.C. § 794.
[4] 42 U.S.C. § 12131 *et seq.*
[5] OCR also enforces the Age Discrimination Act of 1975, 42 U.S.C. § 6101 *et seq.*, and the Boy Scouts of America Equal Access Act, 20 U.S.C. § 7905.  This letter does not specifically address those statutes.
[6] The Department's regulations implementing these statutes are in 34 C.F.R. parts 100, 104, and 106.  Under these federal civil rights laws and regulations, students are protected from harassment by school employees, other students, and third parties.  This guidance focuses on peer harassment, and articulates the legal standards that apply in administrative enforcement and in court cases where plaintiffs are seeking injunctive relief.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

[OCR-00056]

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

rights laws enforced by OCR—race, color, national origin, sex, and disability—to include such bases as sexual orientation and religion. While this letter concerns your legal obligations under the laws enforced by OCR, other federal, state, and local laws impose additional obligations on schools.[7] And, of course, even when bullying or harassment is not a civil rights violation, schools should still seek to prevent it in order to protect students from the physical and emotional harms that it may cause.

Harassing conduct may take many forms, including verbal acts and name-calling; graphic and written statements, which may include use of cell phones or the Internet; or other conduct that may be physically threatening, harmful, or humiliating. Harassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents. Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school. When such harassment is based on race, color, national origin, sex, or disability, it violates the civil rights laws that OCR enforces.[8]

A school is responsible for addressing harassment incidents about which it knows or reasonably should have known.[9] In some situations, harassment may be in plain sight, widespread, or well-known to students and staff, such as harassment occurring in hallways, during academic or physical education classes, during extracurricular activities, at recess, on a school bus, or through graffiti in public areas. In these cases, the obvious signs of the harassment are sufficient to put the school on notice. In other situations, the school may become aware of misconduct, triggering an investigation that could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment. In all cases, schools should have well-publicized policies prohibiting harassment and procedures for reporting and resolving complaints that will alert the school to incidents of harassment.[10]

When responding to harassment, a school must take immediate and appropriate action to investigate or otherwise determine what occurred. The specific steps in a school's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. In all cases, however, the inquiry should be prompt, thorough, and impartial.

If an investigation reveals that discriminatory harassment has occurred, a school must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile

---

[7] For instance, the U.S. Department of Justice (DOJ) has jurisdiction over Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c (Title IV), which prohibits discrimination on the basis of race, color, sex, religion, or national origin by public elementary and secondary schools and public institutions of higher learning. State laws also provide additional civil rights protections, so districts should review these statutes to determine what protections they afford (*e.g.*, some state laws specifically prohibit discrimination on the basis of sexual orientation).

[8] Some conduct alleged to be harassment may implicate the First Amendment rights to free speech or expression. For more information on the First Amendment's application to harassment, see the discussions in OCR's Dear Colleague Letter: First Amendment (July 28, 2003), *available at* http://www.ed.gov/about/offices/list/ocr/firstamend.html, and OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001) (*Sexual Harassment Guidance*), *available at* http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

[9] A school has notice of harassment if a responsible employee knew, or in the exercise of reasonable care should have known, about the harassment. For a discussion of what a "responsible employee" is, see OCR's *Sexual Harassment Guidance*.

[10] Districts must adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex and disability discrimination complaints, and must notify students, parents, employees, applicants, and other interested parties that the district does not discriminate on the basis of sex or disability. *See* 28 C.F.R. § 35.106; 28 C.F.R. § 35.107(b); 34 C.F.R. § 104.7(b); 34 C.F.R. § 104.8; 34 C.F.R. § 106.8(b); 34 C.F.R. § 106.9.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

environment and its effects, and prevent the harassment from recurring. These duties are a school's responsibility even if the misconduct also is covered by an anti-bullying policy, and regardless of whether a student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

Appropriate steps to end harassment may include separating the accused harasser and the target, providing counseling for the target and/or harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed. For example, any separation of the target from an alleged harasser should be designed to minimize the burden on the target's educational program (*e.g.*, not requiring the target to change his or her class schedule).

In addition, depending on the extent of the harassment, the school may need to provide training or other interventions not only for the perpetrators, but also for the larger school community, to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond. A school also may be required to provide additional services to the student who was harassed in order to address the effects of the harassment, particularly if the school initially delays in responding or responds inappropriately or inadequately to information about harassment. An effective response also may need to include the issuance of new policies against harassment and new procedures by which students, parents, and employees may report allegations of harassment (or wide dissemination of existing policies and procedures), as well as wide distribution of the contact information for the district's Title IX and Section 504/Title II coordinators.[11]

Finally, a school should take steps to stop further harassment and prevent any retaliation against the person who made the complaint (or was the subject of the harassment) or against those who provided information as witnesses. At a minimum, the school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conducting follow-up inquiries to see if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems.

When responding to incidents of misconduct, schools should keep in mind the following:

- The label used to describe an incident (*e.g.*, bullying, hazing, teasing) does not determine how a school is obligated to respond. Rather, the nature of the conduct itself must be assessed for civil rights implications. So, for example, if the abusive behavior is on the basis of race, color, national origin, sex, or disability, and creates a hostile environment, a school is obligated to respond in accordance with the applicable federal civil rights statutes and regulations enforced by OCR.

- When the behavior implicates the civil rights laws, school administrators should look beyond simply disciplining the perpetrators. While disciplining the perpetrators is likely a necessary step, it often is insufficient. A school's responsibility is to eliminate the

---

[11] Districts must designate persons responsible for coordinating compliance with Title IX, Section 504, and Title II, including the investigation of any complaints of sexual, gender-based, or disability harassment. *See* 28 C.F.R. § 35.107(a); 34 C.F.R. § 104.7(a); 34 C.F.R. § 106.8(a).

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

hostile environment created by the harassment, address its effects, and take steps to ensure that harassment does not recur. Put differently, the unique effects of discriminatory harassment may demand a different response than would other types of bullying.

Below, I provide hypothetical examples of how a school's failure to recognize student misconduct as discriminatory harassment violates students' civil rights.[12] In each of the examples, the school was on notice of the harassment because either the school or a responsible employee knew or should have known of misconduct that constituted harassment. The examples describe how the school should have responded in each circumstance.

**Title VI: Race, Color, or National Origin Harassment**

- *Some students anonymously inserted offensive notes into African-American students' lockers and notebooks, used racial slurs, and threatened African-American students who tried to sit near them in the cafeteria. Some African-American students told school officials that they did not feel safe at school. The school investigated and responded to individual instances of misconduct by assigning detention to the few student perpetrators it could identify. However, racial tensions in the school continued to escalate to the point that several fights broke out between the school's racial groups.*

    In this example, school officials failed to acknowledge the pattern of harassment as indicative of a racially hostile environment in violation of Title VI. Misconduct need not be directed at a particular student to constitute discriminatory harassment and foster a racially hostile environment. Here, the harassing conduct included overtly racist behavior (*e.g.*, racial slurs) and also targeted students on the basis of their race (*e.g.*, notes directed at African-American students). The nature of the harassment, the number of incidents, and the students' safety concerns demonstrate that there was a racially hostile environment that interfered with the students' ability to participate in the school's education programs and activities.

    Had the school recognized that a racially hostile environment had been created, it would have realized that it needed to do more than just discipline the few individuals whom it could identify as having been involved. By failing to acknowledge the racially hostile environment, the school failed to meet its obligation to implement a more systemic response to address the unique effect that the misconduct had on the school climate. A more effective response would have included, in addition to punishing the perpetrators, such steps as reaffirming the school's policy against discrimination (including racial harassment), publicizing the means to report allegations of racial harassment, training faculty on constructive responses to racial conflict, hosting class discussions about racial harassment and sensitivity to students of other races, and conducting outreach to involve parents and students in an effort to identify problems and improve the school climate. Finally, had school officials responded appropriately

---

[12] Each of these hypothetical examples contains elements taken from actual cases.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

and aggressively to the racial harassment when they first became aware of it, the school might have prevented the escalation of violence that occurred.[13]

- *Over the course of a school year, school employees at a junior high school received reports of several incidents of anti-Semitic conduct at the school. Anti-Semitic graffiti, including swastikas, was scrawled on the stalls of the school bathroom. When custodians discovered the graffiti and reported it to school administrators, the administrators ordered the graffiti removed but took no further action. At the same school, a teacher caught two ninth-graders trying to force two seventh-graders to give them money. The ninth-graders told the seventh-graders, "You Jews have all of the money, give us some." When school administrators investigated the incident, they determined that the seventh-graders were not actually Jewish. The school suspended the perpetrators for a week because of the serious nature of their misconduct. After that incident, younger Jewish students started avoiding the school library and computer lab because they were located in the corridor housing the lockers of the ninth-graders. At the same school, a group of eighth-grade students repeatedly called a Jewish student "Drew the dirty Jew." The responsible eighth-graders were reprimanded for teasing the Jewish student.*

The school administrators failed to recognize that anti-Semitic harassment can trigger responsibilities under Title VI. While Title VI does not cover discrimination based solely on religion,[14] groups that face discrimination on the basis of actual or perceived shared ancestry or ethnic characteristics may not be denied protection under Title VI on the ground that they also share a common faith. These principles apply not just to Jewish students, but also to students from any discrete religious group that shares, or is perceived to share, ancestry or ethnic characteristics (*e.g.*, Muslims or Sikhs). Thus, harassment against students who are members of any religious group triggers a school's Title VI responsibilities when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices. A school also has responsibilities under Title VI when its students are harassed based on their actual or perceived citizenship or residency in a country whose residents share a dominant religion or a distinct religious identity.[15]

In this example, school administrators should have recognized that the harassment was based on the students' actual or perceived shared ancestry or ethnic identity as Jews (rather than on the students' religious practices). The school was not relieved of its responsibilities under Title VI because the targets of one of the incidents were not actually Jewish. The harassment was still based on the perceived ancestry or ethnic characteristics of the targeted students. Furthermore, the harassment negatively affected the ability and willingness of Jewish students to participate fully in the school's

---

[13] More information about the applicable legal standards and OCR's approach to investigating allegations of harassment on the basis of race, color, or national origin is included in *Racial Incidents and Harassment Against Students at Educational Institutions: Investigative Guidance*, 59 Fed. Reg. 11,448 (Mar. 10, 1994), *available at* http://www.ed.gov/about/offices/list/ocr/docs/race394.html.

[14] As noted in footnote seven, DOJ has the authority to remedy discrimination based solely on religion under Title IV.

[15] More information about the applicable legal standards and OCR's approach to investigating complaints of discrimination against members of religious groups is included in OCR's Dear Colleague Letter: Title VI and Title IX Religious Discrimination in Schools and Colleges (Sept. 13, 2004), *available at* http://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

education programs and activities (*e.g.*, by causing some Jewish students to avoid the library and computer lab). Therefore, although the discipline that the school imposed on the perpetrators was an important part of the school's response, discipline alone was likely insufficient to remedy a hostile environment. Similarly, removing the graffiti, while a necessary and important step, did not fully satisfy the school's responsibilities. As discussed above, misconduct that is not directed at a particular student, like the graffiti in the bathroom, can still constitute discriminatory harassment and foster a hostile environment. Finally, the fact that school officials considered one of the incidents "teasing" is irrelevant for determining whether it contributed to a hostile environment.

Because the school failed to recognize that the incidents created a hostile environment, it addressed each only in isolation, and therefore failed to take prompt and effective steps reasonably calculated to end the harassment and prevent its recurrence. In addition to disciplining the perpetrators, remedial steps could have included counseling the perpetrators about the hurtful effect of their conduct, publicly labeling the incidents as anti-Semitic, reaffirming the school's policy against discrimination, and publicizing the means by which students may report harassment. Providing teachers with training to recognize and address anti-Semitic incidents also would have increased the effectiveness of the school's response. The school could also have created an age-appropriate program to educate its students about the history and dangers of anti-Semitism, and could have conducted outreach to involve parents and community groups in preventing future anti-Semitic harassment.

**Title IX: Sexual Harassment**

- *Shortly after enrolling at a new high school, a female student had a brief romance with another student. After the couple broke up, other male and female students began routinely calling the new student sexually charged names, spreading rumors about her sexual behavior, and sending her threatening text messages and e-mails. One of the student's teachers and an athletic coach witnessed the name calling and heard the rumors, but identified it as "hazing" that new students often experience. They also noticed the new student's anxiety and declining class participation. The school attempted to resolve the situation by requiring the student to work the problem out directly with her harassers.*

    Sexual harassment is unwelcome conduct of a sexual nature, which can include unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a sexual nature. Thus, sexual harassment prohibited by Title IX can include conduct such as touching of a sexual nature; making sexual comments, jokes, or gestures; writing graffiti or displaying or distributing sexually explicit drawings, pictures, or written materials; calling students sexually charged names; spreading sexual rumors; rating students on sexual activity or performance; or circulating, showing, or creating e-mails or Web sites of a sexual nature.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 7- Dear Colleague Letter: Harassment and Bullying

In this example, the school employees failed to recognize that the "hazing" constituted sexual harassment. The school did not comply with its Title IX obligations when it failed to investigate or remedy the sexual harassment. The conduct was clearly unwelcome, sexual (*e.g.*, sexual rumors and name calling), and sufficiently serious that it limited the student's ability to participate in and benefit from the school's education program (*e.g.*, anxiety and declining class participation).

The school should have trained its employees on the type of misconduct that constitutes sexual harassment. The school also should have made clear to its employees that they could not require the student to confront her harassers. Schools may use informal mechanisms for addressing harassment, but only if the parties agree to do so on a voluntary basis. Had the school addressed the harassment consistent with Title IX, the school would have, for example, conducted a thorough investigation and taken interim measures to separate the student from the accused harassers. An effective response also might have included training students and employees on the school's policies related to harassment, instituting new procedures by which employees should report allegations of harassment, and more widely distributing the contact information for the district's Title IX coordinator. The school also might have offered the targeted student tutoring, other academic assistance, or counseling as necessary to remedy the effects of the harassment.[16]

**Title IX: Gender-Based Harassment**

- *Over the course of a school year, a gay high school student was called names (including anti-gay slurs and sexual comments) both to his face and on social networking sites, physically assaulted, threatened, and ridiculed because he did not conform to stereotypical notions of how teenage boys are expected to act and appear (e.g., effeminate mannerisms, nontraditional choice of extracurricular activities, apparel, and personal grooming choices). As a result, the student dropped out of the drama club to avoid further harassment. Based on the student's self-identification as gay and the homophobic nature of some of the harassment, the school did not recognize that the misconduct included discrimination covered by Title IX. The school responded to complaints from the student by reprimanding the perpetrators consistent with its anti-bullying policy. The reprimands of the identified perpetrators stopped the harassment by those individuals. It did not, however, stop others from undertaking similar harassment of the student.*

As noted in the example, the school failed to recognize the pattern of misconduct as a form of sex discrimination under Title IX. Title IX prohibits harassment of both male and female students regardless of the sex of the harasser—*i.e.*, even if the harasser and target are members of the same sex. It also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping. Thus, it can be sex discrimination if students are harassed either for exhibiting what is perceived as a stereotypical characteristic for their

---

[16] More information about the applicable legal standards and OCR's approach to investigating allegations of sexual harassment is included in OCR's *Sexual Harassment Guidance*, available at http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

sex, or for failing to conform to stereotypical notions of masculinity and femininity. Title IX also prohibits sexual harassment and gender-based harassment of all students, regardless of the actual or perceived sexual orientation or gender identity of the harasser or target.

~~Although Title IX does not prohibit discrimination based solely on sexual orientation,~~ Title IX does protect all students, including lesbian, gay, bisexual, and transgender (LGBT) students, from sex discrimination. When students are subjected to harassment on the basis of their LGBT status, they may also, as this example illustrates, be subjected to forms of sex discrimination prohibited under Title IX. The fact that the harassment includes anti-LGBT comments or is partly based on the target's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy overlapping sexual harassment or gender-based harassment. In this example, the harassing conduct was based in part on the student's failure to act as some of his peers believed a boy should act. The harassment created a hostile environment that limited the student's ability to participate in the school's education program (*e.g.*, access to the drama club). Finally, even though the student did not identify the harassment as sex discrimination, the school should have recognized that the student had been subjected to gender-based harassment covered by Title IX.

In this example, the school had an obligation to take immediate and effective action to eliminate the hostile environment. By responding to individual incidents of misconduct on an *ad hoc* basis only, the school failed to confront and prevent a hostile environment from continuing. Had the school recognized the conduct as a form of sex discrimination, it could have employed the full range of sanctions (including progressive discipline) and remedies designed to eliminate the hostile environment. For example, this approach would have included a more comprehensive response to the situation that involved notice to the student's teachers so that they could ensure the student was not subjected to any further harassment, more aggressive monitoring by staff of the places where harassment occurred, increased training on the scope of the school's harassment and discrimination policies, notice to the target and harassers of available counseling services and resources, and educating the entire school community on civil rights and expectations of tolerance, specifically as they apply to gender stereotypes. The school also should have taken steps to clearly communicate the message that the school does not tolerate harassment and will be responsive to any information about such conduct.[17]

### Section 504 and Title II: Disability Harassment

- *Several classmates repeatedly called a student with a learning disability "stupid," "idiot," and "retard" while in school and on the school bus. On one occasion, these students tackled him, hit him with a school binder, and threw his personal items into the garbage. The student complained to his teachers and guidance counselor that he was continually being taunted and teased. School officials offered him counseling services and a*

---

[17] Guidance on gender-based harassment is also included in OCR's *Sexual Harassment Guidance*, available at http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

> *psychiatric evaluation, but did not discipline the offending students. As a result, the harassment continued. The student, who had been performing well academically, became angry, frustrated, and depressed, and often refused to go to school to avoid the harassment.*
>
> In this example, the school failed to recognize the misconduct as disability harassment under Section 504 and Title II. The harassing conduct included behavior based on the student's disability, and limited the student's ability to benefit fully from the school's education program (*e.g.*, absenteeism). In failing to investigate and remedy the misconduct, the school did not comply with its obligations under Section 504 and Title II.
>
> Counseling may be a helpful component of a remedy for harassment. In this example, however, since the school failed to recognize the behavior as disability harassment, the school did not adopt a comprehensive approach to eliminating the hostile environment. Such steps should have at least included disciplinary action against the harassers, consultation with the district's Section 504/Title II coordinator to ensure a comprehensive and effective response, special training for staff on recognizing and effectively responding to harassment of students with disabilities, and monitoring to ensure that the harassment did not resume.[18]

I encourage you to reevaluate the policies and practices your school uses to address bullying[19] and harassment to ensure that they comply with the mandates of the federal civil rights laws. For your convenience, the following is a list of online resources that further discuss the obligations of districts to respond to harassment prohibited under the federal antidiscrimination laws enforced by OCR:

- *Sexual Harassment: It's Not Academic* (Revised 2008):
  http://www.ed.gov/about/offices/list/ocr/docs/ocrshpam.html

- *Dear Colleague Letter: Sexual Harassment Issues* (2006):
  http://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html

- *Dear Colleague Letter: Religious Discrimination* (2004):
  http://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html

- *Dear Colleague Letter: First Amendment* (2003):
  http://www.ed.gov/about/offices/list/ocr/firstamend.html

---

[18] More information about the applicable legal standards and OCR's approach to investigating allegations of disability harassment is included in OCR's Dear Colleague Letter: Prohibited Disability Harassment (July 25, 2000), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.

[19] For resources on preventing and addressing bullying, please visit http://www.bullyinginfo.org, a Web site established by a federal Interagency Working Group on Youth Programs. For information on the Department's bullying prevention resources, please visit the Office of Safe and Drug-Free Schools' Web site at http://www.ed.gov/offices/OESE/SDFS. For information on regional Equity Assistance Centers that assist schools in developing and implementing policies and practices to address issues regarding race, sex, or national origin discrimination, please visit http://www.ed.gov/programs/equitycenters.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

- *Sexual Harassment Guidance* (Revised 2001):
  http://www.ed.gov/about/offices/list/ocr/docs/shguide.html

- *Dear Colleague Letter: Prohibited Disability Harassment* (2000):
  http://www.ed.gov/about/offices/list/ocr/docs/disabharassltr.html

- *Racial Incidents and Harassment Against Students* (1994):
  http://www.ed.gov/about/offices/list/ocr/docs/race394.html

Please also note that OCR has added new data items to be collected through its Civil Rights Data Collection (CRDC), which surveys school districts in a variety of areas related to civil rights in education. The CRDC now requires districts to collect and report information on allegations of harassment, policies regarding harassment, and discipline imposed for harassment. In 2009-10, the CRDC covered nearly 7,000 school districts, including all districts with more than 3,000 students. For more information about the CRDC data items, please visit http://www2.ed.gov/about/offices/list/ocr/whatsnew.html.

OCR is committed to working with schools, students, students' families, community and advocacy organizations, and other interested parties to ensure that students are not subjected to harassment. Please do not hesitate to contact OCR if we can provide assistance in your efforts to address harassment or if you have other civil rights concerns.

For the OCR regional office serving your state, please visit: http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm, or call OCR's Customer Service Team at 1-800-421-3481.

I look forward to continuing our work together to ensure equal access to education, and to promote safe and respectful school climates for America's students.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights