IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **MOTHER DOE and FATHER DOE, on** | ) | |
| **behalf of JOHN DOE, their minor child,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:23-cv-00498** |
| | ) | |
| **SUMNER COUNTY BOARD OF** | ) | **JUDGE CAMPBELL** |
| **EDUCATION d/b/a SUMNER COUNTY** | ) | **MAGISTRATE JUDGE HOLMES** |
| **SCHOOLS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the Court is Defendant Sumner County Board of Education's ("Defendant" or the "Board") Motion for Summary Judgment (Doc. No. 87). Plaintiffs Mother Doe and Father Doe (collectively, "Plaintiffs") filed an Opposition (Doc. No. 93), and Defendant filed a Reply (Doc. No. 110). For the reasons set forth below, Defendant's Motion for Summary Judgment is **DENIED** in part and **GRANTED** in part.

## I. BACKGROUND

This lawsuit arises out of an incident between players on the Hendersonville High School ("HHS") football team. As discussed below, the parties disagree in part on the facts surrounding Plaintiffs' claims. As a result, the Court will provide a summary of the facts from its review of the record.[1]

---

[1] For ease of reference the Court cites Defendant's Statement of Facts together with Plaintiffs' response (Doc. No. 104) as "Def. SOF ¶ ____," and Plaintiffs' Statement of Additional Facts together with Defendant's response (Doc. No. 119) as "Pl. SOF ¶ ____."

## A. The Fieldhouse Incident

The incident leading up to this lawsuit (the "Fieldhouse Incident") occurred on Thursday, September 29, 2022. (Def. SOF ¶ 16; Pl. SOF ¶ 1). While Doe was using his cellphone in the locker room, as part of what both players understood to be "horsing around" and a "joke," "a senior player, [T.S.],[2] snatched [Doe]'s phone and ran away with it. [] Doe chased [T.S.] from the locker room into the connecting fieldhouse where they began wrestling over the phone." (Def. SOF ¶¶ 16–17; Pl. SOF ¶¶ 1–2). "[T.S.] got on top of [Doe] and attempted to get him to 'tap out' like in a wrestling match." (Def. SOF ¶ 18). Multiple other teammates were present, although Doe does not remember which ones. (*Id.* ¶ 19). However, no coaches or school officials were present. (*Id.* ¶ 28). While the two players were wrestling, someone shouted "get his pants." (*Id.*). One or multiple teammates then pulled Doe's pants and underwear down, and another player, L.W., "squirted" or "splattered" chocolate pudding in "the crevice of [Doe's] bottom."[3] (*Id.* ¶ 20; Pl. SOF ¶ 4-5). Doe does not recall any other contact with his buttocks or genitals, and no player present at that time verbally referred thereto or otherwise made a sexually charged comment. (Def. SOF ¶¶ 24-26). However, T.S. "emulate[ed] a homoerotic act of anal sex by dry humping Doe from behind." (Pl.

---

[2]     In the interest of protecting the privacy of non-parties, the Court will omit names and identifying characteristics of the students involved, even though some of these students have likely reached the age of majority.

[3]     The parties dispute whether the pudding landed "on" or "inside" Doe's buttocks. But this disagreement appears to be definitional rather than factual, insofar as the dispute is not about where the pudding landed but rather about which preposition, *i.e.*, "on" or "inside," is more appropriate. (*Compare* Def. SOF ¶ 20, *with* Pl. SOF ¶ 5). When asked to clarify the issue during his deposition, Doe testified that the pudding landed "in the crevice of [his] bottom." (*Id.* (citing Doe's sealed deposition)).

SOF ¶ 3). An unknown player videotaped the "dry humping" portion of the incident.[4] (Doc. No. 112 at 51–55).

## B. Before the Fieldhouse Incident

The conduct toward Doe was not an isolated event. During the 2021–22 academic year, Doe witnessed other players on the football team engage in "horseplay" in the fieldhouse. (Def. SOF ¶ 5). For instance, players would run around with other players' belongings and engage in physical contact. (*Id.*). Doe did not report this behavior to coaches or other school officials. (*Id.*) In the fall of 2022, Doe started playing on HHS's varsity and junior varsity teams. (*Id.* ¶ 6) He heard about an incident involving other players, in which a group of players attempted to pull down a teammate's pants and spank him. Doe did not report this alleged incident. (*Id.* ¶ 12).

Another team member, T.I., stated that during the 2021–22 school year, football players showed him a video of a varsity football player naked in the locker room, trying to cover his genitals while other players "were jumping around him, laughing and yelling." (T.I. Decl., Doc. No. 97, ¶ 3). During the 2022–23 school year, T.I. witnessed other instances of involuntary exposure of private parts within HHS's football facilities. (*Id.* ¶¶ 2, 7). Specifically, players engaged in "pantsing" when coaches were not present in the fieldhouse. (*Id.* ¶ 5). "Pantsing" consisted of "pulling down another's pants or shorts to expose that student's buttocks or genitals." (*Id.*). T.S., one of the players involved in the incident involving Doe, was "well known among the football players" for engaging in pantsing. (*Id.*). The players who were involuntarily "pantsed" did not find it funny. (*Id.* ¶¶ 6, 7). In at least one instance, the student who was "pantsed" got into a fight with the perpetrator. (*Id.* ¶ 7).

---

[4]     The video was manually filed. (*See* Doc. Nos. 42-1, 43).

T.I. stated that the players "couldn't talk to the coaches about these hazing incidents because [they] would be criticized for doing so by the coaches themselves for wasting their time or for being a snitch." (*Id*. ¶ 8). At most the coaches would "say something along the lines of 'I'll keep an eye on it' and then proceed to leave the locker rooms completely unmonitored." (*Id*.).

Defendant also received complaints about sexual assault by a member of the football team outside the locker room. In 2021, a female freshman, K.K., alleged she was sexually assaulted by a football player in a movie theater. (Pl. SOF ¶ 17). After K.K. reported the issue, Defendant separated the two students and issued a preventive no-contact order. (*Id.* ¶ 19; K.K. Dep., Doc. No. 98 at 33). K.K. reported subsequent verbal and sexual harassment, but HHS determined that no violation of the of the no-contact order had occurred. (K.K. Dep., Doc. No. 98 at 33). K.K. also met with HHS's Title IX Coordinator, but Defendant determined that Title IX was not implicated and nobody advised her about Title IX or related procedures. (*Id.* ¶¶ 22–24; K.K. Dep., Doc. No. 98 at 51). K.K. ended up transferring to another school. (K.K. Dep., Doc. No. 98 at 52)

## C. After the Fieldhouse Incident

### 1. Complaint

Immediately following the Fieldhouse Incident, Doe participated in football practice and was called names such as "pudding boy." (Doc. No. 104 ¶ 28). After practice, Doe told his mother about the incident. She and Doe then reported the incident to James Beasley ("Coach Beasley"), the head football coach, that same afternoon. (*Id.* ¶ 31; Pl. SOF ¶ 36). In response, Doe and his mother testified, Coach Beasley asked T.S. to apologize but also called Doe a "tattletale." (*See* Doc. No. 100 at 24; Doc. No. 112 at 49; Pl. SOF ¶ 36). Coach Beasley did not collect videos from student cell phones or take further action at that time. (Pl. SOF ¶ 50).

4

The next day at school, on Friday, September 30, 2022, Doe was teased about the incident, and a student told him that he heard Doe "got raped the other day." (Def. SOF ¶ 34). At around 3 p.m. that afternoon, Doe's stepfather spoke to Coach Beasley, asking why the school hadn't called him about the incident. (Def. SOF ¶ 35; Beasley Dep., Doc. No. 117 at 35-37). Coach Beasley responded that that he had not "had the chance to look into the details of what happened yet" and informed Doe's stepfather that he would handle the discipline when he "got the chance to figure out what's appropriate discipline for this action." (Beasley Dep., Doc. No. 117 at 38). After this conversation, Doe's stepfather reported the matter to the local sheriff's office and filed a report with HHS's school resource officer ("SRO"), and Coach Beasley reported the incident to HHS's athletic director (the "Athletic Director"). (Def. SOF ¶ 35; Pl. SOF ¶ 43).

### 2. Investigation and Disciplinary Process

That same Friday afternoon, the Athletic Director and the SRO interviewed Doe and three of the students involved in the incident. (Def. SOF ¶ 40). Following those interviews, the Athletic Director informed the school's principal (the "Principal") of the information he had gathered regarding the incident. (*See* Doc. No. 115 at 6–9). The Principal gave the three students a three-day, out-of-school suspension pending further investigation and prohibited them from participating in the football game that evening. (*See id.* at 8–10; Def. SOF ¶¶ 41, 42). However, the suspended students were permitted to attend the game in their jerseys and walk the sidelines. (Def. SOF ¶ 42; Pl. SOF ¶ 46).

Over the weekend, the Principal attempted to contact Doe's mother by telephone and email. (Def. SOF ¶ 43). School was not in session the following week due to fall break. (*Id.* ¶ 49). Nonetheless, on Monday, October 3, 2022, "the Board continued its investigation of the fieldhouse

5

incident . . . and began interviewing the football team coaching staff, including [Coach] Beasley." (*Id.* ¶ 44). On Tuesday, October 4, 2022, the Principal and the SRO continued interviewing the football players present during the Fieldhouse Incident. (*Id.* ¶ 45). On Wednesday, October 5, 2022, the Title IX Coordinator had a telephone call with Doe's stepfather, "outlining the safety plan that the school would put in place for [Doe]'s return, as well as addressing [Doe's stepfather's] questions and concern regarding Board policies." (*Id.* ¶ 46). On Thursday, October 6, 2022, the Title IX Coordinator sent Doe's parents "a written safety plan," outlining the following measures: (i) increased supervision of the football team in all spaces; (ii) training and review of reporting procedures for coaching staff; (iii) re-emphasized expectation that "this type of behavior" is not acceptable; (iv) suspension of all students involved from the football team for at least a week; (v) prohibition of retaliation against Doe; and (vi & vii) additional reporting channels for Doe. (*Id.* ¶ 47).[5] On Monday, October 10, 2022, the Title IX Coordinator "offered to meet with [] Doe to put in place a safety plan for his return to classes. She also communicated with his parents regarding school transfer options." (*Id.* ¶ 49). On Tuesday, October 11, 2022, the Principal "reached out and facilitated a meeting for [] Doe with his football coaches and teammates … [He] also advised [] Doe's parents that the school could communicate with his teachers" to excuse absences and extend deadlines. (*Id.* ¶ 50). HHS also "facilitated an IEP meeting to ensure any accommodations [] Doe needed were [] met." (*Id.*).

Defendant further "issued additional suspensions for a total of 10 days, from October 10 to October 21, pending disciplin[ary] hearings" to the three players previously suspended – T.S., W.H., and L.W. (*See* Def. SOF ¶ 48). However, this suspension was not strictly enforced. Indeed,

_____

[5]    The parties dispute whether this plan would have been sufficiently implemented. (Def. SOF ¶ 47).

6

L.W. parked his car in the parking lot adjacent to the practice field and watched the practice. (T.I. Decl., Doc. No. 97 ¶ 10). T.S. attended a football game while wearing a mask and even spoke with a coach. (*Id.*).

On Wednesday, October 12, 2022, "the Board held disciplinary hearings" for the three previously suspended students. (*Id.* ¶ 51). Doe was not allowed to attend the disciplinary hearings; nor was he informed of what sanctions (if any) were imposed. (Pl. SOF ¶ 67). Defendant sent the three students – T.S., W.H., and L.W. – to an alternative school. (Def. SOF ¶ 51; Cotter Dep., Doc. No. 96 at 89-91).[6] This decision was "held in abeyance" for W.H. to allow him to finish his suspension, and was ultimately lifted for T.S. and L.W., "other than time already served," after they appealed the decision. (Cotter Dep., Doc. No. 96 at 91). T.S. returned to HHS on October 25, 2022. (*Id.* at 95). It is unclear whether L.W. ever enrolled in the alternative school – he never attended the intake and remained on the roster at HHS. (*Id.* at 96).

Coach Beasley was "responsible for all the actions of the football team." (Pl. SOF ¶ 32). Coach Beasley's duties included supervising the fieldhouse where the incident occurred. (*Id.*). "In the immediate aftermath" of the Fieldhouse Incident, Defendant required Coach Beasley to create a plan of action to increase supervision in the fieldhouse going forward. (*Id.* ¶ 34). Coach Beasley submitted a plan addressing "Things Done to Change Locker Room Procedures in Fall of 2022" and "Plan of Action Moving Forward Past the 2022 Seasons." (*Id.* ¶ 35; Doc. No 114 at 38).

On November 8, 2022, Defendant held a training session for all of the athletic coaches "on the duties required of coaches in light of the Fieldhouse Incident." (Def. SOF ¶ 54). The person who conducted the training stated that the HHS's football staff was "the least receptive" to the

---

[6] In citations to depositions, the page number is the page number of the deposition transcript.

training. (Pl. SOF ¶¶ 53-54). The HR Director "flagged Coach Beasley for his response to the post-assault training" and found that Coach Beasley was "reluctant to prepare a detailed document," presented "attitudinal barriers," was a "whiner," and was "defiant." (*Id*. ¶¶ 50-54). On November 10, 2022, Defendant sent Coach Beasley a disciplinary letter for failing to timely report the Fieldhouse Incident. (Def. SOF ¶ 56).

At the time, Defendant's Title IX sexual harassment policy, which had last been updated in 2014, did not contain the "2020 definition of 'sexual assault' as an independent[,] stand-alone type of sexual harassment." (Pl. SOF ¶¶ 8, 9). The policy allowed school principals discretion on whether to report incidents to the Title IX Coordinator based on what they discovered during the investigation. (Pl. SOF ¶ 12; Brown Dep., Doc. No. 113 at 140-141, and Ex. 2 at PageID# 1786).

HHS ultimately determined that the Fieldhouse Incident was an assault, but not sexual assault, and that it did not fall under the purview of Title IX, in part because it was not reported as discrimination. (Pl. SOF ¶¶ 25, 27 39; Brown Dep., Doc. No. 113 at 150, 154). The Principal, who was in charge of the investigation and tasked with determining whether sexual assault had occurred, did not recall what definition he used to determine that the incident was not a sexual assault and was "not aware of the applicable FBI definition." (Pl. SOF ¶ 26). The Principal did not refer Plaintiffs to a Title IX process or grievance procedure (*Id.* ¶ 29). On November 11, 2022, the HR Director sent a letter to Doe's parents, "noting that the investigation on the Fieldhouse Incident had been closed and his findings submitted to [the Board's Director of Schools], who issued corrective action." (Def. SOF ¶ 57).

8

3. <u>School Transfer</u>

On Monday October 17, 2022, Doe's parents indicated that they wished to have Doe transfer to another school in the county. (Def. SOF ¶ 52). The Director of Schools approved Doe's transfer and waived the appeals process normally required. (*Id*.). He also sent a letter of support for athletic eligibility requesting that Doe be allowed to participate in athletics immediately. (*Id*. ¶ 54). Doe transferred to the new school, where he was also teased about the Fieldhouse Incident. (Pl. SOF ¶ 7). Doe testified that the teasing increased at the new school, both in class and in the football locker room, and that students there told him "everybody knows why you're at [the new school]," "why should I be scared of a dude that got pinned down on the ground and pudding got shoved up his butt," and "don't let me get the pudding." (Doe Dep., Doc. No. 112 at 155-56). Doe did not recall whether he reported these incidents to anyone at the new school. (*Id*. at 160).

**D.    The Lawsuit**

Plaintiffs bring claims on behalf of their son John Doe against the Sumner County Board of Education (the "Board") for violation of Title IX, both before and after the incident (Counts I and II, respectively), as well as violations of the Equal Protection Clause for failure to train (Count III) and deliberate indifference (Count IV). (*See generally* Doc. No. 42).

Before turning to Defendant's arguments concerning the claims, the Court will first address Defendant's argument that John Doe's stepfather, who is not a biological or adoptive father, legal guardian, or guardian ad litem, is not a proper representative party under Federal Rule of Civil Procedure 17(c). (*See* Doc. No. 88 at 9–10). Rule 17(c) provides that "a general guardian," "a committee," "a conservator," or "a like fiduciary" may sue on behalf of a minor. Fed. R. Civ. P. 17(c)(1).

9

The Court need not consider whether Doe's stepfather is, as Plaintiffs argue, a "like fiduciary" because the parties do not dispute that Doe's mother was a proper representative party (*see* Doc. No. 88 at 8–9; Doc. No. 93 at 24–25), and because the record indicates that Doe has recently attained the age of majority and must, therefore, proceed on his own behalf.[7] (*See* Doe Dep., Doc. No. 112 at 5); *Howell v. Father Maloney's Boys' Haven, Inc*., 424 F. Supp. 3d 511, 515-16 (W.D. Ky. 2020) (substituting minor plaintiff for that of representative because minor has attained the age of majority).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The summary judgment movant has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's claim or case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cnty*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the

---

[7]    Given the sensitive nature of the allegations, the Court's prior ruling that Plaintiffs may proceed pseudonymously (Doc. No. 20) remains unchanged.

10

credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* A mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595.

### III. Title IX (Counts I and II)

Title IX prohibits discrimination based on sex in any education program receiving federal funding. *S.C. v. Metro. Gov't of Nashville and Davidson Cty.*, 86 F.4th 707, 714 (6th Cir. 2023) (citing 20 U.S.C. § 1681(a)). "[S]tudent-on-student sexual harassment, if sufficiently severe, can [] rise to the level of discrimination actionable under [Title IX]." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). And when the harasser is "under the school's disciplinary authority, schools can face liability for deliberate[ ] indifferen[ce] to known acts of student-on-student sexual harassment." *S.C.*, 86 F.4th at 714 (internal quotation marks omitted)."

A Title IX claim based on student-on-student sexual harassment requires the plaintiff to establish: "(1) sexual harassment that 'was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school'; (2) the school 'had actual knowledge of the sexual harassment'; and (3) the school 'was deliberately indifferent to the harassment.'" *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville* ("*Doe #2*"), 35 F.4th 459, 463 (6th Cir. 2022) (citing *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012)). Such claims may take the form of "'before' claims, regarding

the school's conduct before the student victims were harassed, and 'after' claims, concerning the school's conduct after the student victims were harassed." *S.C.*, 86 F.4th at 714-15. Both "before" and "after" claims require "sexual harassment that 'was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school.'" *Doe #2*, 35 F.4th at 463.

To establish deliberate indifference, Title IX plaintiffs must prove four elements of a deliberate-indifference-based intentional tort: (1) knowledge, (2) an act, (3) injury, and (4) causation. *Kollaritsch*, 944 F.3d at 621.

The parties disagree on whether the conduct at issue here was actionable sexual harassment. Accordingly, the Court begins there.

**A.    Sexual Harassment**

As relevant to the claims raised in this case, to be actionable sexual harassment, the offending conduct must be based upon the student's sex, and must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Tumminello v. Father Ryan High Sch.*, 678 F. App'x 281, 284 (6th Cir. 2017); *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 619 (6th Cir. 2019). Department of Education Regulations provide that sexual harassment includes certain specific offenses, including "[s]exual assault" meaning "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of

12

Investigation." *See* 34 C.F.R. § 106.2 (3)(i)(2024); *formerly* 34 C.F.R. 106.30 (2020) (referencing the definition of sexual assault in 20 U.S.C. 1092(f)(6)(A)(v)).[8]

Defendant argues that Plaintiffs' Title IX claims fail because the Fieldhouse Incident did not amount to actionable sexual harassment because it was not "based on sex" and was not "severe, pervasive, and objectively offensive." (*See* Doc. No. 88 at 15–20; Doc. No. 110 at 1–3). Plaintiffs disagree with Defendant on both grounds and argue that because the conduct at issue constituted "sexual assault" under Department of Education regulations, it was necessarily based on sex and does not require a showing that it was "severe, pervasive, and objectively offensive."[9] (*See* Doc. No. 93 at 4–5 (citing Order denying Motion to Dismiss, Doc. No. 76; and 35 C.F.R. § 106.30(a)(1)-(3)(2020)).

The Court will address these arguments in turn.

1.   Conduct Based on Sex

While "[c]ourts have recognized that student-on-student sexual harassment is actionable under Title IX" (*Tumminello v. Father Ryan High Sch.*, 678 F. App'x 281, 284 (6th Cir. 2017)), "Congress has not turned everyday schoolhouse teasing into a potential federal suit in which every

---

[8]     The Department of Education regulations define "[s]ex-based harassment" as including quid pro quo harassment, hostile environment harassment, and certain specific offenses, including sexual assault. *See* 34 C.F.R. § 106.2 (2024). Although the regulations were amended in 2024, for purposes of the claims in this case, the definition of sexual harassment remains effectively the same as at the time of the relevant conduct. *Compare* 34 C.F.R. § 106.30(a) (2020), *with* 34 C.F.R. § 106.2 (2024).

[9]     Plaintiffs also assert that the Court "has already determined that the facts being alleged qualify as Title IX 'sexual harassment,'" and that the Court should determine the conduct at issue constitutes sexual harassment for purposes of Title IX for the same reasons discussed in the Court's Order denying Defendant's motion to dismiss. (*See* Doc. No. 93 at 4-5). The Court does not construe this argument as asserting that the ruling on the motion to dismiss is somehow dispositive at this stage. Indeed, it is well established that that "the law of the case doctrine does not apply to earlier proceedings where a different legal standard governs." *In re B & P Baird Holdings*, 759 F. App'x 468, 477 (6th Cir. 2019).

13

childish slight lays bare the school coffers." *Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 557–58 (E.D. Tenn. 2018)). As such, "Title IX does not cover every instance of student-on-student harassment that likely occurs on a regular basis in most schools. For instance, generalized bullying—motivated by personal animus, opportunism, or social status—is not the sort of conduct proscribed by Title IX." *Id.* (citing *Sanches*, 647 F.3d at 165).

To be actionable, offending conduct must be based upon the student's sex. *Tumminello*, 678 F. App'x at 284. No matter how egregious, conduct is not actionable under Title IX if not motivated by the victim's sex. *See, e.g.*, *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 759–62 (6th Cir. 2006); *Tumminello*, 678 F. App'x at 286. Moreover, harassment that is sexual in nature is not necessarily based on sex, even when it involves lewd comments and/or the touching of intimate parts. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998); *Vickers*, 453 F.3d at 759–62; *King v. Super Serv. Inc.*, 68 F. App'x 659, 663 (6th Cir. 2003); *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 505, 520–22 (6th Cir. 2001); *Dillon v. Frank*, 952 F.2d 403 (6th Cir. 1992))."'

In the specific context of same-sex athletics at school, this and other districts have often found that sexually charged hazing or bullying was enough to raise a material issue of fact on whether the events were based on sex. *See, e.g., Hamilton*, 329 F. Supp. 3d at 561 (denying summary judgment and noting that "when faced with an incident of sexual assault in the context of hazing, it is not unreasonable for a jury to infer that the purpose of the attack has a basis in the victim's sex"); *Roe v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1026–27 (E.D. Cal. 2009) (concluding that "[a]lthough Title IX was not intended and does not function to protect students from bullying generally, the homophobic language used by the perpetrators appears to be part of a larger constellation of sexually-based conduct, which included assaulting Plaintiff with an

14

[object], exposing their [body parts], and grabbing his bare buttocks in the shower" and that there remained a factual dispute "on the issue of whether the conduct at issue relate[s] to gender."); *Doe v. Rutherford Cty., Tenn., Bd. of Educ.*, 2014 WL 4080163, at *2 (M.D. Tenn. Aug. 18, 2014) (denying summary judgment in a case involving sexual bullying among basketball teammates); *Mathis v. Wayne Cty. Bd. of Educ.*, 782 F. Supp. 2d 542, 551 (M.D. Tenn. 2011) (same); *Hamilton*, 329 F. Supp. 3d at 561 (finding triable issues of fact on Title IX claim involving assault and hazing among members of boys' basketball team); *see also S.C.*, 579 F. Supp. 3d at 1036 (M.D. Tenn. 2022), *aff'd*, 86 F.4th 707 (6th Cir. 2023) (harassment that is sexual in nature is more likely to be discriminatory).

Although the Sixth Circuit has not specifically addressed the issue, other courts have held that conduct meant to attack the victim's masculinity is based on sex. *See Hamilton*, 329 F. Supp. 3d at 561 ("Sexually exploitative hazing in male athletics *is* based on the victim's gender *if* the acts have the intended goal of 'diminish[ing]' the victim's 'masculinity' or male identity." (emphasis in original)); *accord Schmedding v. Tnemec*, 187 F.3d 862, 865 (8th Cir. 1999); *Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d 952, 965 (D. Kan. 2005).

Here, Defendant argues there is no evidence that the harassment was based on sex because: (1) nobody touched Doe's anus or penis; (2) nobody was trying to have sex with him; and (3) nobody used homosexual slurs or said anything about Doe's masculinity. (*See* Doc. 88 at 16–17 (citing Def. SOF ¶¶ 21–26)). Still, Defendant ignores that someone pulled Doe's pants down, that Doe testified that L.W. "squirted" or "splattered" pudding "in the crevice of [his] bottom," that the record contains a video of T.S. "dry humping" Doe during the incident, and that another student subsequently told Doe that he "heard [Doe] got raped the other day" in reference to the Fieldhouse

15

Incident. The Court also notes that, while nobody uttered a homosexual slur or said anything directly about Doe's masculinity, a jury could reasonably equate "dry humping" and splattering of pudding onto Doe's exposed buttocks to a homosexual slur or obscene gesture directed at Doe's masculinity. Viewing this evidence in light most favorable to Plaintiffs, the Court finds that the record raises a triable issue of fact on whether the events were based on Doe's sex.

2. Severe, Pervasive, and Objectively Offensive

Defendant next argues that "[e]ven if . . . the [i]incident was based on sex, it was not severe, pervasive, or objectively offensive" to be actionable under Title IX. (Doc. No. 88 at 19). Defendant further argues that a single incident cannot be pervasive. (*See id.* at 19–20). For the reasons below, the Court finds that, viewed in light most favorable to Plaintiffs, the evidence raises a triable issue of fact with respect to severity, pervasiveness, and objectively offensiveness.

"'Severe' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass." *Kollaritsch*, 944 F.3d at 620–21. "'Objectively offensive' means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively" *Id.* at 621 (quoting *Davis*, 526 U.S. at 652); *see also R.L. v. Knox Cnty*, 2023 WL 11971017, at *6 n.9 (E.D. Tenn. Nov. 28, 2023), *aff'd*, 2024 WL 4695966 (6th Cir. Nov. 6, 2024) (same). "'Pervasive means 'systemic' or 'widespread'" *Id.* at 620 (quoting *Davis*, 526 U.S. at 652). A single incident is not enough.[10] *Id.*; *see also*, *Doe #2*, 35 F.4th at 465–66. "Whether gender-oriented conduct rises to the level of actionable harassment [] depends on a constellation of surrounding circumstances,

---

[10]     However, there is no requirement that the victim be the same in the context of a "before" claim or when it involves high school students. *See Doe #2*, 35 F.4th at 466–68 (refusing to extend the same-victim requirement of *Kollaritsch* to "before" claims and to "students in high school").

expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved. The victim's perceptions are not determinative. *Kollaritsch*, 944 F.3d at 621 (citing *Davis*, 526 U.S. at 651).

"'Simple acts of teasing and name-calling are not enough[.]'" *Id.* at 620-21 (quoting *Davis*, 526 U.S. at 652); *see also R.L.*, 2023 WL 11971017, at *6 n.9 (same). Indeed, courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. Put differently, "schools serve as the testing ground for a variety of behaviors that would be unacceptable elsewhere, and [] only sufficiently egregious behavior will subject a funding recipient to liability." *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1026 (E.D. Cal. 2009) (citing *Davis*, 526 U.S. at 652).

That is not to say that verbal harassment is never enough. *See Doe v. Plymouth-Canton Cmty. Sch.*, 2022 WL 17858955 at *8 (E.D. Mich. June 3, 2022) ("it is possible to assert a Title IX claim based exclusively on verbal harassment"). Still, "claims based at least in part on physical contact are more often found to be sufficiently severe in the Title IX context." *Loudon*, 2024 U.S. Dist. LEXIS 68645 at *12; *see also Plymouth-Canton*, 2022 WL 17858955 at *8 ("courts tend to consider verbal harassment to be less severe than physical harassment."). Accordingly, this and other districts have often found conduct involving physical contact to be severe and objectively offensive. *See, e.g., Mathis*, 782 F. Supp. 2d at 550; *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999); *Hamilton*, 329 F. Supp. 3d at 563; *Loudon*, 2024 U.S. Dist. LEXIS 68645 at *12; *Rutherford*, 2014 WL 4080163 at *2; *Callahan*, 678 F. Supp. 2d at 1026.

17

Here, viewed in the light most favorable to Plaintiffs, the facts include pulling Doe's pants down, "squirt[ing]" or "splatter[ing]" pudding "in the crevice of [his] bottom" as well as dry humping him in a suggestive manner. Because these facts involve physical contact, the Court finds that the record raises a material issue of fact on whether the incident was severe enough to support a Title IX claim. For the same reasons, as well as because the record shows that "pantsing" was generally upsetting for students on the receiving end and that the Fieldhouse Incident became a source of mockery against Doe, the Court finds that the evidence suffices to raise a triable issue on whether the events were objectively offensive, insofar as they involved a violation of Doe's body and personal privacy in a manner potentially humiliating for a high schooler. *See Loudon*, 2024 U.S. Dist. LEXIS 68645 at *15 (objective offensiveness prong met where the "behavior was more than run-of-the-mill roughhousing, which, amongst middle-schoolers, might involve occasional inappropriate touching and vulgarity").

With regard to pervasiveness, a widespread "pattern of student-on-student sexual misconduct" can count as a prior incident in support of a "before" claim. *See Doe # 2* at 465–66 (noting that a "before" claim requires more than one incident). Here, the record contains testimony that football players at HHS were engaging in "pantsing" and potentially other acts of stripping and involuntary exposure of intimate parts. These incidents bear some resemblance to the Fieldhouse Incident. The Court also finds K.K.'s testimony (K.K. Dep., Doc. No. 98), alleging sexual assault by football players, to be relevant to the pervasiveness analysis. *See Loudon*, 2024 U.S. Dist. LEXIS 68645 at *22 ("Though the Sixth Circuit has not described just how similar previous reports of harassment must be to the at-issue conduct in a 'before'-claim context, it would be unreasonable to assume the behavior must be nearly identical to put the school on notice of

18

'pervasive sexual misconduct' on its campuses."). The Court finds that this evidence suffices to raise a material issue of fact on whether student-on-student sexual misconduct was widespread at HHS prior to the Fieldhouse Incident.

In addition, after Doe reported the Fieldhouse Incident, he was subjected to teasing from students at HHS and at the new school. Courts have acknowledged that verbal taunting about the a prior incident of sexual assault can contribute to making the overall harassment pervasive. *See, e.g., Hamilton*, 329 F. Supp. 3d at 563; *see also S.C.*, 579 F. Supp. 3d at 1037–38 (post-assault threats were pervasive). Accordingly, viewing the evidence in light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that the Fieldhouse Incident, in conjunction with the post-incident taunting, amounted to pervasive sexual harassment, insofar as it occurred in the locker room, at practice, at school, and even at Doe's new school. *See Loudon*, 2024 U.S. Dist. LEXIS 68645 at *13 (noting that the harassment occurred at the student's locker, in the bathroom, and in the lunchroom, and concluding that "[t]he frequency and persistence of the alleged harassment is sufficient to meet the pervasiveness standard"). In sum, the Court finds that record raises a material issue of fact on the threshold issue of actionable sexual harassment.

Having so concluded, the Court does not separately consider whether the conduct qualifies as sexual assault under the Department of Education Guidelines.

## B. "Before" Claim (Count I)

The Sixth Circuit adopted the following test for Title IX "before" claims based upon a school's alleged deliberate indifference:

> (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive,

19

and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school."

*Doe #2*, 35 F.4th at 465 (6th Cir. 2022), (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020)); *S.C.*, 86 F.4th at 715 (same). "[P]ut differently, in a successful 'before' claim, a school's deliberate indifference to known past acts of sexual misconduct must have caused the misconduct that the student currently alleges." *Doe #2*, 35 F.4th at 466 (citation omitted).

Defendant argues that the evidence fails to establish the two first prongs, *i.e.*, reports of sexual misconduct and deliberate indifference thereto, which created a heightened risk of sexual harassment that was known or obvious. (*See* Doc. No. 88 at 8–15). But the facts upon which Defendant relies are either disputed or, viewed in the light most favorable to Plaintiffs, do not support its argument. Specifically, Defendant contends that the district-wide disciplinary records only show one incident of sexual harassment and four "isolated bullying incidents" since 2019. (*See id.* at 13–14 (citing Def. SOF ¶ 15)). On this basis, Defendant distinguishes prior Sixth Circuit cases in which a "before" claim survived summary judgment based on numerous prior instances of documented sexual misconduct among students. (*See id.* at 13–14 (citing *Doe #2*, 35 F.4th at 464 *and S.C.*, 86 F.4th 707 at 715)). As a result, Defendant argues that the record contains "no evidence of any prior sexual misconduct – let alone sexual misconduct – at [HHS] or at any of the Board's district high schools, which could support a Title IX *before* claim in this case." (Doc. No. 88 at 13).

There are questions of fact concerning prior instances of sexual harassment. (*See* Pl. Resp. to Def. SOF ¶ 15). Plaintiffs point to testimony casting doubt on whether all complaints for sexual misconduct, such as those involving the Freshman, are reflected in Defendant's disciplinary records, especially given that school principals had discretion in deciding whether to escalate

20

reports to the Title IX Coordinator. (*See* Doc. No. 93 at 14 (citing Pl. SOF ¶¶ 17-24); K.K. Dep., Doc. No. 98 at 29-37; Brown Dep., Doc. No. 113 at 141; *see also* Sarver Dep., Doc. No. 114 at 90 (mentioning instances in which students shared inappropriate pictures)).

The record also contains testimony that sexual misconduct was occurring at HHS, specifically within the football program. Indeed, T.I. stated that he saw a video of a naked player trying to cover his genitals while being laughed and yelled at by other players and witnessed multiple instances of involuntary exposure of private parts within HHS's football facilities. (See T.I. Decl., Doc. No. 97). He also stated that one player was "well known" for engaging in "pantsing." (*Id.*). Viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude that involuntary exposures were common within the football program.

The issue of whether Defendant was aware of and deliberately indifferent to this misconduct is a closer call. Defendant contends that only a handful of complaints involving sexual harassment, sexual misconduct, bullying, or hazing appear in its district-wide disciplinary records, and that those incidents did not involve a school athletic team. (Def. SOF ¶ 15). But, in so arguing, Defendant relies on disputed facts. Indeed, Plaintiffs' theory is that Defendant has a history of ignoring complaints for sexual misconduct or willfully misclassifying them as not falling within Title IX's purview; insofar as such complaints existed but were not properly processed nor recorded in the district's disciplinary records. (*See id.*; Doc. No. 93 at 9-15).

Defendant further points out that the alleged sexual misconduct occurred when coaches were not present, which is undisputed (*see* Pl. SOF ¶ 16), and that Coach Beasley "never witnessed or received any reports of any stripping and whipping incidents at HHS." (Def. SOF ¶ 15). But

21

this fact is disputed, and the evidence contains testimony that directly contradicts Defendant's position. Indeed, in reference to the "pantsing," T.I. stated:

> We couldn't talk to the coaches about these hazing incidents because you would be criticized for doing so by the coaches themselves for wasting their time or for being a snitch. On the off chance that they did offer to do something about it, they would say something along the lines of "I'll keep an eye on it" and then proceed to leave the locker rooms completely unmonitored.

(T.I. Decl., Doc. No. 97 ¶ 8).

Viewed in the light most favorable to Plaintiffs, this statement implies that (i) players had reported misconduct to the coaches on more than one occasion; (ii) the coaches either brushed off the reports or did not take any action; and (iii) the coaches discouraged further reporting. A reasonable jury could conclude that the coaches had actual knowledge of the hazing and that their conduct amounted to deliberate indifference, facilitating and ultimately leading to the incident involving Doe. *See Hamilton*, 329 F. Supp. 3d at 570 (coach's actual knowledge of prior sexual misconduct and failure to act was deliberate indifference and "clearly unreasonable conduct," which caused the sexual misconduct at issue); *Mathis*, 782 F. Supp. 2d 542, 549–51 (same).

Accordingly, Defendant's motion for summary judgment on Count I will be denied. In light of this conclusion, the Court need not separately consider Plaintiff's argument concerning purported deficiencies in Defendant's Title IX policies.

## C. "After" Claim (Count II)

"A plaintiff bringing an 'after' claim must show that the school: (1) has been 'deliberately indifferent to sexual harassment,' (2) 'of which it has actual knowledge,' and (3) which 'is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to

22

the educational opportunities or benefits provided by the school.'" *R.L. v. Knox Cnty.*, 2024 WL 4695966, at *5 (6th Cir. Nov. 6, 2024) (quoting *Kollaritsch*, 944 F.3d at 619 (6th Cir. 2019)).

Defendant argues that the Court should grant summary judgment in its favor on the "after" claim because: (1) there were no incidents of actionable sexual harassment after Plaintiffs reported the Fieldhouse Incident; and (2) its response was not "clearly unreasonable." (*See* Doc. No. 88 at 20-24). The Court will address these arguments in turn.

### 1. Further Harassment

As a threshold matter, the parties disagree on the applicable legal standard. Specifically, Defendant argues that post-actual knowledge harassment is required. (*See* Doc. No. 88 at 20; Doc. No. 110 at 4 n.9 (citing *Kollaritsch v. Mich. St. Univ. Bd. of Trustees*, 944 F.3d 613, 623-24 (2019); and *Doe #2*, 35 F.4th at 468). Plaintiffs respond that "Sixth Circuit precedent squarely holds that '*Kollaritsch* … does not apply to students in high school'" and that Plaintiffs are only required to show that Defendant's response made Doe "liable or vulnerable" to further acts of harassment. (Doc. No. 93 at 15 (citing *Doe #2*, 35 F.4th at 468; and *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)).

In *Kollaritsch*, a case involving university students, the Sixth Circuit held that deliberate indifference to sexual harassment requires a showing of "a [first] instance of harassment, the school's actual knowledge of it, and that further actionable harassment would not have happened by for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch v. Mich. St. Univ. Bd. of Trustees*, 944 F.3d 613, 623-24 (2019). In *Kollaritsch*, the Sixth Circuit stated that the "further harassment must be inflicted against the same victim." *Id.* at 621-22 (stating

23

that "the further harassment must be against the same victim" and therefore, "the plaintiff 'cannot … premise the [further harassment] element of her Title IX claim on conduct [by the perpetrator] directed at third parties'").

Three years later, a different panel of the Sixth Circuit held that *Kollaritsch's* "same victim requirement" does not apply to a Title IX claim in a high school setting. *Doe #2*, 35 F.4th at 468. As relevant here, *Doe #2* involved a Title IX "after" claim brought by Jane Doe, who was a victim of "unwelcome sexual activity" and subsequent circulation of a video. *Doe #2* at 462. Jane Doe reported the incidents to the school, which questioned her and then told her it was safe to return to class. She returned to class but withdrew the next day because she was afraid to remain at the school. *Id*. Jane Doe claimed the school's inadequate response to the harassment caused her harm. *Id*. at 466. The district court dismissed Jane Doe's "after" claim under *Kollaritsch* because Jane Doe had not been subjected to further harassment.

The Sixth Circuit remanded Jane Doe's "after" claim, with orders for the district court to "consider whether the claim survives without applying *Kollaritsch*." *Id*. at 468. In so doing, the *Doe #2* Court wrote in terms of the "same victim requirement," specifically stating that it "decline[d] to extend Kollaritsch's same-victim requirement to a Title IX claim in a high school setting." *Id*. The court explained that "a high school's elevated disciplinary authority, supervision, and control over students is distinct from the university context and therefore the same-victim requirement does not apply to 'after' claims against high schools." *S.C.*, 86 F.4th at 713 (citing *Doe #2*, 35 F.4th at 467-68).

These decisions have resulted in debate on the limitations of *Kollaritsch* following *Doe #2*. Plaintiffs argue that *Doe #2* held that *Kollaritsch* does not apply in the high school context at all

24

and that the Court should instead look to *Davis* for the applicable standard. Defendant argues that *Doe #2* merely eliminates the "same-victim" requirement, but not the requirement that there be further harassment. The Sixth Circuit has not directly revisited this issue.[11] Given the narrow wording of the directive in Doe #2 – that the same victim requirement does not apply – it appears that the remainder of the *Kollaritsch* analysis and holding remains in effect.

The *Kollaritsch* court rejected the same argument as that raised by Plaintiffs here – that further harassment is not required under *Davis v. Monroe County Board of Education*, and that it is enough if the school's actions make a student "vulnerable" to harassment. *Id*. at 622-23. *Davis* concerned a school's response to harassment of a fifth-grade student by another student. *Davis*, 526 U.S. 633. In that case, the Supreme Court explained the causation requirement for claims against a school in cases of student-on-student harassment as follows: "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a

---

[11]  After *Doe #2*, the Sixth Circuit has considered two cases involving high school students, neither of which directly considered the question of whether further harassment is required for an "after" claim. *See S.C. v. Metro. Gov't of Nashville and Davidson Cty*., 86 F.4th 707 (6th Cir. 2023) (school was aware of "continuing and severe threats made against [the plaintiff] and their disruption to her education" and did "nothing in response"); *R.L. v. Knox Cty., Tenn*., No. 24-5002, 2024 WL 4695966 (6th Cir. Nov. 6, 2024) (plaintiff had further encounters with the other student after she reported harassment to school, but did not show that the school's response was clearly unreasonable)

District courts in this circuit that have considered the question have concluded further harassment is required. *See e.g., A.T. v. Cleveland City Sch. Bd. of Educ.*, No. 1:22-CV-110-TAV-SKL, 2024 WL 4333685, at *12, *13 n.6 (E.D. Tenn. Sept. 27, 2024) (rejecting argument that *Doe #2* allows "Title IX liability in a high school setting even when no new harassment occurred"); *Doe v. Plymouth-Canton Cmty. Sch.*, No. 19-10166, 2022 WL 1913074 at *9 (noting that *Doe #2* merely refused to extend the same-victim requirement to claims in a high-school setting and that the standard of deliberate indifference articulated in *Kollaritsch* is still applicable)).

25

minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. 644-45.

The Sixth Circuit concluded that this language does not allow liability based on mere vulnerability to harassment and found the plaintiffs' argument was a "misreading of *Davis* as a whole and the causation element in particular." *Kollaritsch*, 944 F.3d at 623. The *Kollaritsch* court explained, "*Davis* does not link the deliberate indifference directly to the injury (*i.e.*, it does *not* speak of subjecting students to *injury*); *Davis* requires a showing that the school's 'deliberate indifference 'subject[ed]' its students to *harassment*,' necessarily meaning further actionable harassment." *Id.* at 622 (emphasis in original) (citing *Davis*, 526 U.S. at 644)). Given that the *Kollaritsch* Court's analysis regarding the requirement of further actionable harassment is based on *Davis*, a case involving fifth-grade students, the Court concludes further harassment is also required here.

Here, Plaintiffs claim that, after Coach Beasley was notified of the incident, Doe was subjected to teasing by other classmates the day after the incident and by students at the new school. Specifically, the next day at school, a student told Doe that he heard Doe "got raped the other day" and someone waved pudding in his face. (Pl. SOF ¶ 6). After Doe transferred to a new school, students there also teased him. (*Id*. ¶ 6).

Defendant argues that the teasing described by Doe, which was limited to a handful of remarks, was not severe or pervasive enough to constitute actionable sexual harassment and that there is no evidence that they are causally connected Defendant's actions or lack thereof. Plaintiffs do not claim the teasing was further actionable harassment, only that Defendant's response to the Fieldhouse Incident "caused Doe to fear further harm, causing him to withdraw from [HHS]

26

altogether." (Doc. No. 93 at 16). In the same vein, the Doe family was "not comfortable sending … Doe back to practice or school when they knew that multiple boys involved in the assault had not been disciplined and would be there" is also insufficient. (*Id.* ¶ 22) Indeed, "[a]n assailant being in the mere presence of a victim does not constitute actionable harassment." *A.T.*, 2024 WL 4333685 at *13; *Doe v. Univ. of Ky.*, 959 F.3d 246, 251-52 (6th Cir. 2020) (that the assailant approached the victim at a party, followed her home, sat near her in the library, and started at her during class was not enough to meet the sexual harassment prong, "let alone sexual harassment that is of a severe, pervasive, and objectively offensive nature.").

Because Plaintiffs' have not shown that Doe suffered further actionable sexual harassment after the school was notified of the Fieldhouse Incident, the "after" claim fails.[12] Even if Plaintiffs had established some further actionable sexual harassment after the school was notified of the Fieldhouse Incident, Defendant's response was not "clearly unreasonable."

### 2. Clearly Unreasonable

"A school is considered deliberately indifferent to student-on-student harassment where its 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *S.C.*, 86 F.4th at 715 (quoting *Davis*, 526 U.S. at 648). The question is "not whether the school's efforts were ineffective but whether they amounted to 'an official decision ... not to remedy the violation.'" *Id.* (citing *Foster v. Bd. of Regents of the Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020) (en banc)). The school is not required "to 'remedy' sexual harassment nor

---

[12]     And even if these post-actual-knowledge verbal incidents were actionable harassment, Plaintiffs do not argue that they are causally connected Defendant's actions or lack thereof; nor does the evidence, even in light most favorable to Plaintiffs, appear contain elements that could support the inference of such causal link.

ensure that students conform their conduct to certain rules, but rather, the [school] must merely respond to known peer harassment in a manner that is not clearly unreasonable." *R.L. v. Knox Cty., Tenn.*, No. 24-5002, 2024 WL 4695966, at * 5 (6th Cir. Nov. 6, 2024) (citing *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)). "[A]n ineffective response [does not] necessarily generate[] a jury issue on deliberate indifference." *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020). "Title IX does not give victims a right to 'make particular remedial demands.'" *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (quoting *Davis*, 526 U.S. at 648). "Moreover, courts should avoid second-guessing school administrators' disciplinary decisions." *Id.* (citing *Davis*, 526 U.S. at 648 *and Vance*, 231 F.3d at 260)).

Defendant argues its response to the incident was not clearly unreasonable. Specifically, within one day of receiving the report of the incident, it began interviewing Doe and the three football players initially identified as being involved. Each of the players received an initial three day suspension. The following week, while the school was on break, the Title IX coordinator provided Doe with a written safety plan for his return to the football team, and Defendant continued its investigation by interviewing the coaching staff and additional players. While the investigation was pending, these players were held back from practice. The three players initially identified were issued 10-day suspensions pending disciplinary hearings. Following those hearings, the players were assigned to an alternative school, though it is not clear if any of them ever attended that school. Disciplinary measures were also implemented among the coaching staff – the Director of Athletics conducted additional mandatory training for all coaches and Coach Beasley received a disciplinary letter concerning his delay in reporting the incident. (Def. SOF ¶¶ 55, 56).

28

Plaintiffs argue Defendant's response shows deliberate indifference. Plaintiffs point to Defendant's allegedly inadequate Title IX policy and resulting failure to follow Title IX procedures, failure to label the incident a "sexual assault" thereby avoiding "triggering" Title IX, Coach Beasley's actions (telling Doe not to be a "tattle-tale," changing Doe's report to indicate the incident was "accidental," failing to collect cell phone evidence, delaying reporting the incident to the principal, and resisting corrective measures imposed by the school). (*Id*. at 18 (citing Pl. SOF ¶¶ 36-54)). Finally, Plaintiffs argue that Defendant's imposition of discipline only on three of the students involved and that discipline was unwound after an appeal evidences deliberate indifference. (*Id*. at 24).

While the actions taken by Defendant may be imperfect, they do not evidence deliberate indifference – *i.e.*, "an official decision ... not to remedy the violation." Most of Plaintiffs' arguments are based on Defendant's failure to follow Title IX regulations and Department of Education guidance. (*See* Doc. No. 93 at 18-22). But "[n]oncompliance with Title IX regulations and procedures does not, by itself, establish deliberate indifference or a funding recipient's official decision not to remedy sex-based harassment." *A.T.*, 2024 WL 4333685, at *15 (citing *Plymouth-Canton Cmty. Schs.*, 2022 WL 1913074, at *12 (citing *Gebser*, 524 U.S. at 291–92))); *see also*, *Doe v. Univ. of Ky.*, 959 F.3d 246, 252 (6th Cir. 2020) (holding that the university's "non-compliance with its own administrative policies" did not "amount to deliberate indifference"); *Irvin v. Grand Rapids Pub. Schs.*, 366 F. Supp. 3d 908, 921 (W.D. Mich. 2016) (finding that the defendants' failure to comply with Title IX regulations fails to establish deliberate indifference").

That the discipline imposed, other than time already served, was ultimately lifted on appeal and some students did not receive any discipline also does not establish that Defendant's remedial

measures were "clearly unreasonable." First, the Court generally avoids second guessing school administrators' disciplinary decisions. See *Stiles*, 819 F.3d at 848. Second, Defendant was not required to impose any specific discipline. *Id*. Third, even though the discipline was lifted, except for time-served, and some participants were not disciplined, this does not equate to Defendant making an official decision not to remedy the violation.

Plaintiffs' arguments that Coach Beasley was deliberately indifferent fare no better. To be sure, Coach Beasley was dismissive, told Doe not to be a tattle-tale, failed to report the incident for almost 24 hours, and allowed three of the students who had been suspended to remain on the sidelines during a game. Perhaps these actions could be viewed as clearly unreasonable, but there is no evidence that Coach Beasley's poor response resulted in any further acts of harassment toward Plaintiff. Moreover, after Coach Beasley reported the incident to the Athletic Director, Defendant responded in a manner that, as explained above, was not clearly unreasonable.

Because Plaintiffs have not shown that Defendant's response was clearly unreasonable and have not shown that the response led to further acts of sexual harassment, Plaintiffs' "after" claim fails.

### D. Equal Protection (Counts III and IV)

Defendant argues that summary judgment is also proper on Plaintiffs' section 1983 claims because Plaintiffs cannot establish their Title IX claims. (*See* Doc. No. 88 at 25). Based on the above analysis, the court partially agrees.

#### 1. Failure to Train (Count III)

"To succeed in a 42 U.S.C. § 1983 action, 'a plaintiff must prove the following two elements: (1) the defendant must be acting under the color of state law, and (2) the offending

30

conduct must deprive the plaintiff of rights secured by federal law.'" *MacArthur v. Lamb*, 2018 WL 3966290, at *4 (M.D. Tenn. July 30, 2018) (citing *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998)), *report and recommendation adopted*, 2018 WL 3960128 (M.D. Tenn. Aug. 17, 2018). "The question at summary judgment is, therefore, whether a genuine issue of material fact exists that [the defendant's] conduct deprived [the plaintiff] of a legal right." *Id.*

Relying on its argument with respect to Count I, Defendant argues that "the lack of a predicate constitutional violation precludes a finding of liability against [it] based on any alleged failures in its Title IX compliance and training." (*Id.* at 25). But because the Court denied summary judgment on Count I, it flows from logic that it is not yet settled whether a predicate constitutional violation occurred. In the absence of additional arguments, the Court will therefore deny summary judgment on Count III.

2.  Deliberate Indifference to Ongoing Harassment (Count IV)

As to Count IV, Defendant argues that "because Plaintiff [*sic*] cannot establish deliberate indifference under Title IX, he [*sic*] cannot show deliberate indifference under § 1983." (Doc. No. 88 at 25). For the below reasons, the Court agrees, but only with respect to the "after" claim.

"The deliberate indifference standard used for proving a section 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Stiles*, 819 F.3d at 852 (quoting *Williams v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)). If the court grants summary judgment on an underlying Title IX claim for failure to establish actionable sexual harassment, a section 1983 claim based thereon also fails. *See Dahmer v. W. Kentucky Univ.*, 2021 WL 816914, at *10 (W.D. Ky. Mar. 3, 2021), *aff'd in relevant part*, 2022 WL 19296342 (6th Cir. Oct. 13, 2022) (granting summary judgment

31

on section 1983 claim for deliberate indifference where the underlying Title IX "after" claim failed because the post-actual-knowledge events did not amount to actionable sexual harassment).

Because the evidence raises a genuine dispute of material fact on deliberate indifference with respect to the "before" claim (Count I), the Court will deny summary judgment on the portion of Count IV anchored in Count I. Conversely, because the evidence does not raise a genuine dispute of material fact on the "after" claim (Count II), insofar as the post-actual-knowledge events are not actionable, the Court will grant summary judgment on the portion of Count IV anchored in Count II. The scope of Count IV will therefore be limited to deliberate indifference relating to the Title IX "before" claim.

## IV.   CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (Doc. No. 87) will be **GRANTED** in part and **DENIED** in part. The Motion will be **GRANTED** on Count II and **DENIED** on Counts I and III. The Motion will be **GRANTED** in part and **DENIED** in part on Count IV.

An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE